ACCEPTED
03-16-00301-CV
12727457
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/15/2016 3:18:12 PM
JEFFREY D. KYLE
CLERK

NO. 03-16-00301-CV

In the Third Court of Appeals
Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/15/2016 3:18:12 PM
JEFFREY D. KYLE
Clerk

**Margaret Reid,**
*Appellant-Plaintiff*,

**v.**

**Seton Hospital, Michael Breen, and Ann Czarnik,**
*Appellees-Defendants*.

On Appeal From Cause No. D-1-GN-15-003300
In the 53rd Judicial District Court of Travis County, Texas
Honorable Karen Crump, Presiding Judge

**APPELLEES' RESPONSE BRIEF ON THE MERITS**

NORTON ROSE FULBRIGHT US LLP

Yvonne K. Puig (yvonne.puig@nortonrosefulbright.com)
State Bar No. 16385400
Daphne Andritsos Calderon (daphne.calderon@nortonrosefulbright.com)
State Bar No. 00793266
Eric J. Hoffman (eric.hoffman@nortonrosefulbright.com)
State Bar No. 24074427
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile:  (512) 536-4598

*Counsel for Appellees Seton Family of Hospitals and Michael Breen, M.D.*

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1, Appellees supplement

Appellant's list of trial and appellate counsel with the following:

- The correct names of Appellees are Seton Family of Hospitals, Michael Breen, M.D., and Ann Czarnik, M.D.

- The correct name of the undersigned Appellees' counsel is Daphne Andritsos Calderon, not "Daphne Andritsos" as Appellant states on Page 2 of her opening brief on the merits.

- The correct email address of Daphne Andritsos Calderon is daphne.calderon@nortonrosefulbright.com, not emmaprice@nortonrosefulbright.com as Appellant states on Page 2 of her opening brief on the merits.

- The correct phone number of Daphne Andritsos Calderon is 512-536-2451, not 512-536-5452 as Appellant states on Page 2 of her opening brief on the merits.

- Trial and appellate counsel for the undersigned Appellees also includes Norton Rose Fulbright US LLP, Yvonne K. Puig, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255.

- Appellate counsel for Appellees also includes Norton Rose Fulbright US LLP, Eric J. Hoffman, 98 San Jacinto Blvd., Suite 1100, Austin, Texas 78701-4255.

**TABLE OF CONTENTS**

**PAGE**

IDENTITY OF PARTIES AND COUNSEL ..........................................................i

INDEX OF AUTHORITIES..................................................................................iv

RECORD REFERENCES ......................................................................................1

STATEMENT OF THE CASE................................................................................2

STATEMENT REGARDING ORAL ARGUMENT ...............................................4

ISSUES PRESENTED...........................................................................................5

STATEMENT OF FACTS .....................................................................................6

SUMMARY OF THE ARGUMENT ....................................................................10

ARGUMENT .......................................................................................................13

    I.    Standard of Review ..................................................................................13

    II.    The Trial Court Did Not Abuse Its Discretion in Granting Appellees' Motion to Dismiss................................................................14

        A.    Ms. Reid's Belated Attempt to Comply with Texas Civil Practice & Remedies Code Section 74.051 Did Not Abate the Suit .................................................................................15

            1.    Essential elements of notice under Chapter 74..............15

            2.    Ms. Reid's abatement theory is groundless....................18

        B.    An Abatement Cannot Alter Ms. Reid's Deadline to Serve an Expert Report ..........................................................22

            1.    Abatement under Section 74.052(a) does not toll or extend the 120-day deadline .........................................23

            2.    There is no written agreement to extend the expert report deadline ................................................................30

            3.    *Lim v. West* is inapposite to this case ...........................33

            4.    A "prejudice" analysis is inappropriate.........................37

    III.    The Trial Court Did Not Err by Declining to Enter Findings of Fact and Conclusions of Law ...........................................................41

        A.    Findings of Fact and Conclusions of Law Are Not Required For Dismissals Under Section 74.351 .....................42

  B. Alternatively, the Record Thoroughly Indicates the Bases of the Trial Court's Decision ....................................................45

  C. The Proper Remedy for Error, if Any, is to Abate the Appeal to Allow the Entry of the Missing Findings.................48

CONCLUSION..........................................................................................49

CERTIFICATE OF COMPLIANCE.....................................................50

CERTIFICATE OF SERVICE ...............................................................51

- iii -

# INDEX OF AUTHORITIES

**CASES**                                                                                           **PAGE(S)**

*Am. Online, Inc. v. Williams*,
　958 S.W.2d 268 (Tex. App.—Hous. [14th Dist.] 1997, no pet.) ............................................24

*Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*,
　46 S.W.3d 873 (Tex. 2001) ...................................................................................................25

*Badiga v. Lopez*,
　274 S.W.3d 681 (Tex. 2009) .................................................................................................39

*Barker v. Eckman*,
　213 S.W.3d 306 (Tex. 2006) ...........................................................................................43, 45

*In re Blair*,
　408 S.W.3d 843 (Tex. 2013) .................................................................................................17

*BMC Software Belg., N.V. v. Marchand*,
　83 S.W.3d 789 (Tex. 2002) ...................................................................................................35

*Brock v. Sutker*,
　215 S.W.3d 927 (Tex. App.—Dall. 2007, no pet.) ...............................................................32

*Busch v. Hudson & Keyse, LLC*,
　312 S.W.3d 294 (Tex. App.—Hous. [14th Dist.] 2010, no pet.) ...........................................48

*Sw. Bell Tel. Co., L.P. v. Mitchell*,
　276 S.W.3d 443 (Tex. 2008) .................................................................................................14

*Carreras v. Marroquin*,
　339 S.W.3d 68 (Tex. 2011) ..............................................................................16, 17, 21, 30

*Carroll v. Humsi*,
　342 S.W.3d 693 (Tex. App.—Austin 2011, no pet.) .............................................................13

*Certified EMS, Inc. v. Potts*,
　355 S.W.3d 683 (Tex. 2011) ...........................................................................................14, 18

*Chamberlain v. Chamberlain*,
　788 S.W.2d 455 (Tex. App.—Hous. 1990, writ denied) .......................................................44

*CHCA Woman's Hosp., L.P. v. Lidji*,
　403 S.W.3d 228 (Tex. 2013) .................................................................................................39

*Cherne Indus., Inc. v. Magallanes*,
　763 S.W.2d 768 (Tex. 1989) .................................................................................................45

*City of Rockwall v. Hughes*,
    246 S.W.3d 621 (Tex. 2008)................................................................14, 30

*City of San Antonio v. City of Boerne*,
    111 S.W.3d 22 (Tex. 2003)..........................................................................13

*Cont'l Cas. Co. v. Downs*,
    81 S.W.3d 803 (Tex. 2002)..........................................................................14

*Crouch v. Tenneco, Inc.*,
    853 S.W.2d 643 (Tex. App.—Waco 1993, writ denied) .........................................43

*Davis v. Spring Branch Med. Ctr., Inc.*,
    171 S.W.3d 400 (Tex. App.—Hous. [14th Dist.] 2005, no pet.)................................14, 42, 45

*Downer v. Aquamarine Operators, Inc.*,
    701 S.W.2d 238 (Tex. 1985)..........................................................................13

*Drewery v. Adventist Health Sys./Tex., Inc.*,
    344 S.W.3d 498 (Tex. App.—Austin 2011, pet. denied)............................................13, 37, 38

*Emeritus Corp. v. Highsmith*,
    211 S.W.3d 321 (Tex. App.—San Antonio 2006, pet. denied) ...................................... *passim*

*Estate of Allen ex rel. Allen v. Scott & White Clinic*,
    No. 03-08-00576-CV, 2011 WL 2993259 (Tex. App.—Austin July 22, 2011,
    no pet.) (mem. op.)..............................................................................38

*Etheredge v. McCarty*,
    No. 05-05-00164-CV, 2006 WL 1738258 (Tex. App.—Dall. June 27, 2006,
    no pet.) (mem. op.)..............................................................................37, 38

*Gajewski v. Jackson*,
    351 S.W.3d 608 (Tex. App.—El Paso 2011, no pet.)..............................................39

*Garcia v. Gomez*,
    319 S.W.3d 638 (Tex. 2010)..........................................................................17

*Gulf Coast Med. Ctr., LLC v. Temple*,
    No. 13-09-00350-CV, 2010 WL 196972 (Tex. App.—Corpus Christi-
    Edinburgh Jan. 21, 2010, no pet.) (mem. op.) .................................................28, 29

*Hagedorn v. Tisdale*,
    73 S.W.3d 341 (Tex. App.—Amarillo 2001, no pet.) ...................................... *passim*

*HCBeck, Ltd. v. Rice*,
    284 S.W.3d 349 (Tex. 2009)..........................................................................14, 40

*IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*,
   938 S.W.2d 440 (Tex. 1997).................................................................42, 43, 45

*Intracare Hosp. N. v. Campbell*,
   222 S.W.3d 790 (Tex. App.—Hous. [1st Dist.] 2007, no pet.) ..............................39

*In re J.I.T.P.*,
   99 S.W.3d 841 (Tex. App.—Hous. [14th Dist.] 2003, no pet.)...............................47

*Lal v. Harris Methodist Fort Worth*,
   230 S.W.3d 468 (Tex. App.—Fort Worth 2007, no pet.)...................................37, 38

*Lim v. West*,
   No. 01-08-00469-CV, 2008 WL 4670991 (Tex. App.—Hous. [1st Dist.] Oct.
   23, 2008, pet. denied) (mem. op.)..................................................... *passim*

*McWashington v. Harris Cnty. Hosp. Dist.*,
   208 S.W.3d 64 (Tex. App.--Hous. [14th Dist.] 2006, no pet.) .............................22, 28, 29, 34

*Mocega v. Urquhart*,
   79 S.W.3d 61 (Tex. App.—Hous. [14th Dist.] 2002, pet. denied) .................................. *passim*

*Mokkala v. Mead*,
   178 S.W.3d 66 (Tex. App.—Hous. [14th Dist.] 2005, pet. denied) .................................39, 40

*Olgetree v. Matthews*,
   262 S.W.3d 316 (Tex. 2007)...............................................................39, 41

*Permanente Med. Assoc. of Tex. v. Johnson*,
   917 S.W.2d 515 (Tex. App.—Waco 1996, no writ)..............................................22

*Quint v. Alexander*,
   No. 03-04-00819-CV, 2005 WL 2805576 (Tex. App.—Austin Oct. 28, 2005,
   pet. denied) (mem. op.)...............................................................19, 20, 21

*Sandles v. Howerton*,
   163 S.W.3d 829 (Tex. App.—Dall. 2005, no pet.)..............................................45

*Schepps v. Presbyterian Hosp. of Dall.*,
   652 S.W.2d 934 (Tex. 1983)................................................................21

*Scoresby v. Santillan*,
   346 S.W.3d 546 (Tex. 2011)................................................................40

*Smalling v. Gardner*,
   203 S.W.3d 354 (Tex. App.—Hous. [14th Dist.] 2005, pet. denied) .........................42, 43, 45

*SMI/USA, Inc. v. Profile Techs., Inc.*,
38 S.W.3d 205 (Tex. App.—Waco 2001, no pet.)..................................................................43

*Spectrum Healthcare Res. v. McDaniel*,
306 S.W.3d 249 (Tex. 2010)..................................................................32, 36, 37

*Stockton v. Offenbach*,
336 S.W.3d 610 (Tex. 2011)..................................................................38

*Sullivan v. Barnett*,
471 S.W.2d 39 (Tex. 1971)..................................................................43

*Tenery v. Tenery*,
932 S.W.2d 29 (Tex. 1996)..................................................................44

*Tex. Dep't of Transp. v. City of Sunset Valley*,
146 S.W.3d 637 (Tex. 2004)..................................................................14

*Tomasi v. Liao*,
63 S.W.3d 62 (Tex. App.—San Antonio 2001, no pet.)........................................................42

*Vick v. Rangel*,
No. 04-05-00362-CV, 2005 WL 2438375 (Tex. App.—San Antonio Oct. 5,
2005, no pet.) (mem. op.)..................................................................40

*Watts v. Oliver*,
396 S.W.3d 124 (Tex. App.—Hous. [14th Dist.] 2013, no pet.)..................................................47

*Winters v. Chubb & Son, Inc.*,
132 S.W.3d 568 (Tex. App.—Hous. [14th Dist.] 2004, no pet.)..................................................42

**STATUTES**

TEX. CIV. PRAC. & REM. CODE Chapter 74 ..................................................................*passim*

TEX. CIV. PRAC. & REM. CODE § 74.051 ..................................................................*passim*

TEX. CIV. PRAC. & REM. CODE § 74.051(a) ..................................................................15, 16, 26

TEX. CIV. PRAC. & REM. CODE § 74.051(c) ..................................................................15, 16, 30

TEX. CIV. PRAC. & REM. CODE § 74.052 ..................................................................*passim*

TEX. CIV. PRAC. & REM. CODE § 74.052(a) ..................................................................*passim*

TEX. CIV. PRAC. & REM. CODE § 74.052(c) ..................................................................18

TEX. CIV. PRAC. & REM. CODE § 74.351 ..................................................................*passim*

TEX. CIV. PRAC. & REM. CODE § 74.351(a) .................................................................... *passim*

TEX. CIV. PRAC. & REM. CODE § 74.351(b) ....................................................................15, 41

TEX. CIV. PRAC. & REM. CODE § 74.351(b)(2) ...............................................................37, 38

TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6) ......................................................................41

TEX. FAM. CODE § 154.130(a)(3) ...........................................................................................44

TEX. GOV'T CODE § 311.016(2) ..............................................................................................17

TEX. GOV'T CODE § 311.016(3) ..............................................................................................17

TEX. GOV'T CODE § 311.023(1) ..............................................................................................14

TEX. GOV'T CODE § 311.023(5) ..............................................................................................14

TEX. REV. CIV. STAT. art. 4590i .........................................................................................25, 40

TEX. REV. CIV. STAT. art. 4590i, § 13.01(d) ..........................................................................24

TEX. REV. CIV. STAT. art. 4590i, § 13.01(d)(1) ......................................................................38

**RULES OF PROCEDURE**

TEX. R. APP. P. 44.4 ..................................................................................................................48

TEX. R. APP. P. 44.4(b) .............................................................................................................48

TEX. R. CIV. P. 11 .....................................................................................................................31

TEX. R. CIV. P. 296 .....................................................................................................................8

TEX. R. CIV. P. 297 .....................................................................................................................8

TEX. R. CIV. P. 329b(c) ...........................................................................................................3, 9

# RECORD REFERENCES

The record on appeal is composed of one volume of the Clerk's Record. The Clerk's Record will be abbreviated "CR" and will be cited by reference to the appropriate page number within the single-volume transcript. (*e.g.*, CR 26). The Reporter's Record consists of one volume of transcription of a hearing on Appellees' Motions to Dismiss. The Reporter's Record will be abbreviated "RR" and will be cited by reference to the appropriate page number within the single-volume transcript. (*e.g.*, RR 10).

Selected documents are included in Appellees' Appendix, which will be cited as "Appx. Tab ___", followed by the corresponding tab number (*e.g.*, Appx. Tab 1).

## STATEMENT OF THE CASE

On August 10, 2015, Appellant-Plaintiff Margaret Reid ("Ms. Reid") brought suit against Michael Breen, M.D. ("Dr. Breen"), Ann Czarnik, M.D ("Dr. Czarnik"), and Seton Family of Hospitals ("Seton") (collectively, "Appellees") for alleged medical negligence associated with a total hysterectomy. CR 3-8. As to Dr. Breen, Ms. Reid specifically alleged he was negligent in the performance of the surgery and as to Dr. Czarnik, that she was negligent in the provision of emergency medical services. CR 7-8. Seton was sued only under vicarious liability theories for the conduct of the physicians. CR 9-10.

It is undisputed that the underlying matter is a health care liability case subject to the requirements of Chapter 74 of the Texas Civil Practice & Remedies Code. CR 47.

On September 4, 2015, Seton and Dr. Breen each timely filed Original Answers to the Original Petition denying liability and noting that Ms. Reid failed to comply with Chapter 74's notice requirements. CR 11, 13, 19-20. Seton and Dr. Breen subsequently filed a Motion to Dismiss Ms. Reid's Original Petition with prejudice when she failed to timely serve any Chapter 74 expert report within 120 days of the filing of Seton's and Dr. Breen's Original Answers. CR 29-35. Dr. Czarnik filed a separate but similar motion to dismiss. CR 38-46. On February 4, 2016, the trial court held a hearing on all pending motions and after argument

from the parties, the trial court granted Seton's and Dr. Breen's Motion to Dismiss with prejudice by Order of the same date. CR 86-87 (Appx. Tab 1).

Ms. Reid filed a request for Findings of Fact and Conclusion of Law on February 4, 2016. CR 88. She subsequently timely filed a Motion for New Trial, CR 94-100, which was overruled by operation of law on April 19, 2016. *See* TEX. R. CIV. P. 329b(c). This appeal followed. CR 101-102.

## STATEMENT REGARDING ORAL ARGUMENT

Dr. Breen and Seton respectfully request oral argument on this case as such argument will aid the court in resolution of this appeal.

## ISSUES PRESENTED

1. Did the trial court abuse its discretion in granting Seton's and Dr. Breen's Motion to Dismiss under Texas Civil Practice & Remedies Code Chapter 74? [Restatement of Appellant's Issues 1, 2, and 3]

> A. Did Ms. Reid's notice of claim and medical authorization automatically abate the lawsuit? [Restatement of Appellant's Issues 1 and 2]

> B. If the lawsuit was abated, did such abatement toll the 120-day period in which Ms. Reid was required to serve an expert report where the deadline fell after the conclusion of the abatement period? [Restatement of Appellant's Issue 3]

2. Did the trial court abuse its discretion in declining to file Findings of Fact and Conclusions of Law as requested by Ms. Reid? [Restatement of Appellant's Issue 5]

## STATEMENT OF FACTS

This is a health care liability case arising out of injuries allegedly sustained by Appellant-Plaintiff Margaret Reid after she underwent a hysterectomy surgery performed by Dr. Breen. CR 4-5, 7-8. On August 10, 2015, Ms. Reid filed suit against Seton, Dr. Breen, and Dr. Czarnik alleging that negligent care and treatment rendered by Dr. Breen during the surgery, and rendered by Dr. Czarnik after the surgery, proximately caused her injuries. CR 3, 7-8. Apparently due her experiences post-surgery, Ms. Reid asserted a claim for intentional infliction of emotional distress against Dr. Czarnik only, arising out of Dr. Czarnik's medical treatment in the emergency room setting. CR 9. Ms. Reid also asserted that Seton was vicariously liable for the conduct of Dr. Breen and Dr. Czarnik based on agency and respondeat superior theories. CR 9-10.

On September 4, 2015, Seton and Dr. Breen each timely filed Original Answers, Special Exceptions, and Verified Denials to the Original Petition. CR 11, 19. Both responsive pleadings included verified denials stating under oath that Ms. Reid did not provide a notice of claim letter with medical authorization to Seton and Dr. Breen before the filing of her petition as required by Texas Civil Practice & Remedies Code Section 74.051, *et seq.* CR 13, 17, 20, 23. Dr. Czarnik subsequently filed an Original Answer and General Denial, which included as an

affirmative defense that Ms. Reid had failed to provide the required pre-suit notice and authorization under the Texas Medical Liability Act. CR 27.

On October 1, 2015, counsel for Ms. Reid sent notice of claim letters and accompanying medical authorizations to Seton and Dr. Breen. CR 70, 77-78 (Appx. Tab 2; Appx. Tab 3). In a section entitled "STIPULATION", the letters stated "[w]e hereby stipulate, in response to the exception raised in your original answer to plaintiff's suit, that the plaintiff's lawsuit has been filed without prior notice to you and without furnishing you with a medical authorization form as required in 74.052 of the code." CR 76. The letters continued that the notice was "therefore intended to cure that pleading defect[,]" and was "also intended to abate the lawsuit for sixty days after your receipt of this letter in accordance with the relevant rules." *Id.*

At no time did Seton or Dr. Breen file pleas in abatement or otherwise request an abatement from the trial court. At no time after Seton and Dr. Breen answered the lawsuit did Ms. Reid tender to Seton or Dr. Breen any proposed order on abatement for consideration or negotiation and, as the record reflects, no order granting abatement was ever entered by the court. Further, neither Seton nor Dr. Breen ever entered into any Rule 11 or other agreement with Ms. Reid to abate the case or to extend her deadline to serve expert reports under Texas Civil Practice & Remedies Code Section 74.351. RR 32.

The deadline for Ms. Reid to serve a Chapter 74 expert report as to Seton and Dr. Breen expired on January 4, 2016, without service of any report upon them.  RR 37.  Thus, on January 19, 2016, Seton and Dr. Breen filed a Motion to Dismiss Ms. Reid's Original Petition with prejudice for failure to serve an expert report within 120 days of Seton's and Dr. Breen's Original Answers pursuant to Texas Civil Practice & Remedies Code Section 74.351.  CR 29-35.  Dr. Czarnik also filed a Chapter 74 Motion to Dismiss as to the claims against her.  CR 38-46.  Ms. Reid responded to the motions by urging that the deadline to provide the Chapter 74 report was subject to abatement, CR 49-51, and also moved for sanctions against Seton and Dr. Breen, asserting that the motion to dismiss was frivolous and groundless.  CR 51-52.  On February 4, 2016, the trial court held a hearing on the pending motions and granted Seton's and Dr. Breen's Motion to Dismiss with prejudice and denied Ms. Reid's motion for sanctions.  CR 86-87, Appx. Tab 1.  The trial court also granted Dr. Czarnik's Motion to Dismiss with prejudice on the same day.  CR 81.

Later on February 4, 2016, Ms. Reid filed a Request for Findings of Fact and Conclusions of Law pursuant to Rules 296 and 297 of the Texas Rules of Civil Procedure and subsequently filed a Notice of Past-Due Findings of Fact and Conclusions of Law.  CR 88-89, 92-93.  Ms. Reid then filed a Motion for New

Trial on March 2, 2016, CR 94-100, which Motion was overruled by operation of law at the expiration of 75 days. *See* TEX. R. CIV. P. 329b(c).

This appeal followed. CR 101-102.

## SUMMARY OF THE ARGUMENT

It is undisputed that Ms. Reid asserted health care liability claims against Seton and Dr. Breen but wholly failed to serve Seton or Dr. Breen with any expert report as required by Chapter 74 of the Texas Civil Practice & Remedies Code. It is equally undisputed that there is no court order granting a plea in abatement or extending any deadlines in the underlying case, and that the parties never entered into a Rule 11 Agreement to extend the deadline for Ms. Reid to serve an expert report. Thus, the trial court's order dismissing Ms. Reid's claims against Seton and Dr. Breen for failing to serve any report must be affirmed.

That Ms. Reid provided a notice of claim and medical authorization on October 1, 2015—after the filing of her original petition—is of no consequence. Her belated provision of the notice and authorization required by Texas Civil Practice & Remedies Code Sections 74.051 and 74.052 did not automatically abate the lawsuit for 60 days because there was no court order or other affirmative act by the parties effectuating such an abatement. Concomitantly, an abatement cannot alter the 120-day period to serve expert reports in this lawsuit, and nothing in the statute or case law can support Ms. Reid's interpretation.

To the contrary, pursuant to the statute, an abatement is intended to provide the defendant with a 60-day period upon receipt of a proper pre-suit notice and medical authorization in which he or she can evaluate whether to resolve a claim,

not to extend deadlines attendant to health care claims after they are filed. To that end, even where abatement does occur, Texas courts have consistently held that abatement does not toll a plaintiff's 120-day deadline to serve an expert report where the 120-day deadline falls after the conclusion of the abatement period.

Pursuant to mandatory provisions of Chapter 74, the only mechanism available to extend the statutory deadline to serve an expert report is the filing of a Rule 11 Agreement between the affected parties. There was no Rule 11 Agreement as between the parties here. Thus, in the absence of an agreement, Ms. Reid failed to serve an expert report within 120 days of the filing of Seton's and Dr. Breen's Original Answers, and the trial court had no discretion but to grant the Motion to Dismiss with prejudice. Because Ms. Reid cannot establish that the trial court abused its discretion in ruling that she failed to timely serve any expert report as to Seton or Dr. Breen, the trial court's order granting the Motion to Dismiss cannot and should not be reversed.

Ms. Reid also contends the trial court erred in declining to file findings of fact and conclusions of law pursuant to her request, but has failed to cite any case law requiring such action by the trial court in the context of a Chapter 74 dismissal. Alternatively, even if the trial court erred in declining to file findings of fact and conclusions of law, Ms. Reid has failed to establish she suffered any harm by the trial court's decision to not file findings of fact and conclusions of law, and is in no

way prevented from presenting her case on appeal. To be sure, the correct procedure when a party is harmed by the absence of findings of fact and conclusions of law is not to reverse the trial court's decision, but to abate the appeal and remand to the trial court to enter findings of fact and conclusions of law.

Consequently, Seton and Dr. Breen respectfully request that this Court affirm the trial court's grant of their motion to dismiss.

# ARGUMENT

## I.     Standard of Review

A trial court's decision to grant a motion to dismiss for failure to timely file an expert report under Texas Civil Practice & Remedies Code Section 74.351 is reviewed for an abuse of discretion. *Carroll v. Humsi*, 342 S.W.3d 693, 696 (Tex. App.—Austin 2011, no pet.). A trial court abuses its discretion by acting arbitrarily, unreasonably, or without consideration of guiding legal principles. *See, e.g.*, *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). Where an expert report is not timely served, however, the trial court has no discretion but to dismiss a health care liability claim. *See Drewery v. Adventist Health Sys./Tex., Inc.*, 344 S.W.3d 498, 507 (Tex. App.—Austin 2011, pet. denied).

When the issue requires interpretation of the statute itself, the standard of review is *de novo*. *See Carroll*, 342 S.W.3d at 696 ("[T]o the extent that our analysis requires us to construe chapter 74—a question of law—we apply a de novo standard." (citing *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003))). Likewise, the standard of review for determining whether an abatement occurred and whether an abatement tolled the deadline for filing expert reports under Chapter 74 is also *de novo*. *Hagedorn v. Tisdale*, 73 S.W.3d 341, 347-49 (Tex. App.—Amarillo 2001, no pet.).

In conducting this analysis, the appellate court relies "on the plain meaning of the text unless such a construction leads to absurd results." *Certified EMS, Inc. v. Potts*, 355 S.W.3d 683, 690 (Tex. 2011) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008)). The court is to consider the statute as a whole, not its provisions in isolation, *Cont'l Cas. Co. v. Downs*, 81 S.W.3d 803, 805 (Tex. 2002), *abrogated on other grounds by Sw. Bell Tel. Co., L.P. v. Mitchell*, 276 S.W.3d 443, 444 (Tex. 2008), and also "consider the objective the Legislature sought to achieve through the statute, as well as the consequences of a particular construction." *HCBeck, Ltd. v. Rice*, 284 S.W.3d 349, 352 (Tex. 2009) (citing *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004); TEX. GOV'T CODE § 311.023(1), (5)).

A trial court's decision to decline to file findings of fact and conclusions of law following a Chapter 74 dismissal is reviewed for an abuse of discretion. *See Davis v. Spring Branch Med. Ctr., Inc.*, 171 S.W.3d 400, 413-14 (Tex. App.— Hous. [14th Dist.] 2005, no pet.).

## II. The Trial Court Did Not Abuse Its Discretion in Granting Appellees' Motion to Dismiss

The threshold question on appeal is whether the notice of claim and medical authorization provided by Ms. Reid in October 2015 automatically abated the lawsuit for 60 days. Because the plain language of the statute and applicable case law dictate a "no" answer to the question, and because Ms. Reid did not serve an

expert report upon Seton and Dr. Breen within 120 days of the filing of their Original Answers, RR 37, the trial court's decision to grant Seton's and Dr. Breen's Motion to Dismiss was proper. *See* TEX. CIV. PRAC. & REM. CODE §§ 74.351(a)-(b) (requiring dismissal with prejudice where health care liability claimant fails to serve expert report within 120 days of the filing of defendant's answer) (Appx. Tab 4).

### A. Ms. Reid's Belated Attempt to Comply with Texas Civil Practice & Remedies Code Section 74.051 Did Not Abate the Suit

#### 1. Essential elements of notice under Chapter 74.

In this health care liability suit, Ms. Reid was required to comply with the notice provisions of Chapter 74 including Section 74.051, which specifically provides:

> Any person or his authorized agent asserting a health care liability claim shall give written notice of such claim by certified mail, return receipt requested, to each physician or health care provider against whom such claim is being made at least 60 days *before* the filing of a suit in any court of this state based upon a health care liability claim. The notice must be accompanied by the authorization form for release of protected health information as required under Section 74.052.

TEX. CIV. PRAC. & REM. CODE § 74.051(a) (emphasis added) (Appx. Tab 5). Notice provided in accordance with Sections 74.051 and 74.052 "shall toll the applicable statute of limitations to and including a period of 75 days following the giving of the notice, and this tolling shall apply to all parties and potential parties." *Id.* § 74.051(c).

A plain reading of Section 74.051 reveals that timely provision of the notice and medical authorization form affords a would-be plaintiff a tolling of the statute of limitations for the filing of a health care liability lawsuit for a period of 75 days, not a tolling of the 120 day deadline to file an expert report under Section 74.351. *See Carreras v. Marroquin*, 339 S.W.3d 68, 69 (Tex. 2011) ("[P]roviding notice of a health care liability claim will toll the statute of limitations for seventy-five days, if the notice is 'given as provided' in Chapter 74." (quoting TEX. CIV. PRAC. & REM. CODE § 74.051(c))).

As set forth in controlling Texas case law, the Chapter 74 notice must be accompanied by a medical authorization in accordance with Section 74.052(a) and it is the failure to provide the authorization with the notice that may result in abatement of further proceedings against the health care provider for 60 days. *See Carreras*, 339 S.W.3d at 72 (citing TEX. CIV. PRAC. & REM. CODE §§ 74.051(a), .052(a)). To be clear, Section 74.052(a) expressly provides that the failure of the plaintiff to provide the requisite authorization "along with the notice of health care claim shall abate all further proceedings against the physician or health care

provider receiving the notice until 60 days following receipt" of the authorization by the defendant. TEX. CIV. PRAC. & REM. CODE § 74.052(a) (Appx. Tab 6).[1]

It is axiomatic that a pre-suit notice requirement is just that—it is intended to be furnished *before* the lawsuit is filed, not after. Indeed, case law interpreting this provision explains that the purpose of the pre-suit notice and authorization is intended to allow potential defendants the opportunity to obtain information and determine whether the claim should be resolved *without litigation*. *See, e.g.*, *Carreras*, 339 S.W.3d at 73 (holding purpose of notice provision "is to encourage negotiations and settlement of disputes, prior to suit, thereby reducing litigation costs." (citing *Garcia v. Gomez*, 319 S.W.3d 638, 643 (Tex. 2010))). That the statute provides abatement only if the authorization is not provided with the notice is significant in explaining the purpose of the pre-suit notice at the start. A valid medical authorization for the release of protected health information allows a potential defendant to obtain the medical records of the claimant in advance of litigation so that the extent of injury or damages can arguably be assessed by the would-be defendant and a determination can be made regarding *pre-suit* resolution. In fact, the form prescribed by the statute expressly states that the authorization is

---

[1] Contrary to any suggestion by Ms. Reid that the statute provides that such proceedings "*must* be abated" until 60 days after receipt of the authorization, Open. Br. at 15 (emphasis added), the operative term is "shall abate." TEX. CIV. PRAC. & REM. CODE § 74.052(a); *cf. In re Blair*, 408 S.W.3d 843, 861 (Tex. 2013) ("[W]ith limited exceptions, when a statute uses the term 'must,' it 'creates or recognizes a condition precedent[;]' when a statute uses the term 'shall,' it imposes a duty . . . ." (quoting TEX. GOV'T CODE § 311.016(3), .016(2))).

- 17 -

intended to facilitate "investigation and evaluation of a health care claim." TEX. CIV. PRAC. & REM. CODE § 74.052(c). Here, the filing of the lawsuit before Ms. Reid provided notice and authorization entirely precluded Seton and Dr. Breen from that pre-suit opportunity.

### 2. Ms. Reid's abatement theory is groundless.

It is clear that Ms. Reid failed to comply with the notice provisions of Sections 74.051 and 74.052. CR 76. Nonetheless, Ms. Reid argues that by providing the notice of claim and medical authorization in October 2015—after the filing of her lawsuit—her claims were "effectively abated for 60 days from the receipt of that notice . . . even if these documents were not filed with the court; or even if abatement was not agreed upon by the parties." Open. Br. at 10. In support of this argument, Ms. Reid appears to contend that because Section 74.052 does not contain language explicitly requiring a plea in abatement or the invocation of a "court's involvement for this abatement to apply[,]" *id.* at 15, the opposite must be true—that a plaintiff can unilaterally "self-abate" a case at will where she failed to comply with the notice provisions of Section 74.051 before filing suit. Ms. Reid's interpretation is not supported by any authority or a plain reading of the statute. *See Certified EMS*, 355 S.W.3d at 690.

By their Original Answers, Seton and Dr. Breen each asserted by Verified Denial that Ms. Reid failed to provide the pre-suit notice required by Section

74.051.  CR 13, 20.  At no time, however, did Seton or Dr. Breen ever affirmatively seek an abatement of the proceedings, CR 11-24, nor did their Verified Denials even mention abatement.  CR 13, 20.  Their Verified Denials simply asserted that Ms. Reid filed suit in violation of Section 74.051.  CR 13, 20.

Ms. Reid belatedly provided the required notice and authorization, which contained a "Stipulation" indicating that the notice was "intended to abate the lawsuit for sixty days after your receipt of this letter in accordance with the relevant rules."  CR 76, Appx. Tab 2; Appx. Tab 3.  However, neither before the trial court, nor in this appeal, has Ms. Reid identified any authority in support of the proposition that a plaintiff can bypass the court and unilaterally cause a health care liability claim to be abated without court order.

To the contrary, this Court has held that a plaintiff cannot unilaterally abate a case without court order for the purpose of extending the expert report deadline. *See Quint v. Alexander*, No. 03-04-00819-CV, 2005 WL 2805576, at *4 (Tex. App.—Austin Oct. 28, 2005, pet. denied) (mem. op.).  In *Quint*, the plaintiff asserted a health care liability claim but filed the original petition only five days after providing the notice of intent to file suit.  *Id.*  After the plaintiff failed to serve an expert report on the physician defendant or his attorney before the 120-day deadline, upon the defendant's motion, the district court dismissed the plaintiff's

claim for failure to timely serve an expert report under Section 74.351(a).[2]  *Id.* at

*2.  Among several appellate arguments, the plaintiff urged she had "self-abated"

the case because she voluntarily waited 60 days before amending the original

petition, serving the defendant with the petition, or taking any other action.  *Id.* at

*4.  Because of such "self-abatement," the plaintiff contended that the 120-day

window for service of the expert report actually commenced at the end of her 60-

day period of voluntary delay, such that the deadline did not expire until a full 180

days after the filing of the original petition.  *Id.*

This Court rejected the plaintiff's argument, finding that the plain language

of Section 74.351 required service of the expert report to be made within 120 days

after the date the claim was filed under the former version of the statute.  *Id.* (citing

TEX. CIV. PRAC. & REM. CODE § 74.351(a) (West 2005)).  This Court held the "fact

that [the plaintiff] filed the claim before the expiration of the 60-day pre-suit notice

period in no way changes the requirement that she serve the expert report by the

120th day after filing the original petition."  *Id.*

Significantly, this Court found that the defendant "never requested, and the

court never entered, an order of abatement" in that case.  *Id.*  This Court stated that

---

[2] At the time *Quint* was decided, Section 74.351(a) required the service of an expert report not later than the 120th day after the date the claim was filed.  *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a) (West 2005).  Under the 2013 amendments to Chapter 74, Section 74.351 was amended so that the 120-day deadline is now triggered by the date the defendant's answer is filed.  TEX. CIV. PRAC. & REM. CODE § 74.351(a) (West 2016).

although the defendant in a health care liability claim may request the abatement of a case when the plaintiff fails to provide the required pre-suit notice, "we are unaware of *any authority* that allows a plaintiff to abate a case *without judicial permission* in order to extend the statutory service deadline." *Id.* (citing *Schepps v. Presbyterian Hosp. of Dall.*, 652 S.W.2d 934, 938 (Tex. 1983)) (emphasis added). Accordingly, this Court rejected the plaintiff's position that her voluntary delay extended the time for filing the expert report, and affirmed the trial court's dismissal of her claims. *Id.* at \*4-5.

As in *Quint*, Seton and Dr. Breen never affirmatively requested abatement, nor did the trial court ever enter any order abating the case. Consistent with this Court's holding in *Quint*, the Court must reject Ms. Reid's contention that a plaintiff can unilaterally abate a case on account of her failure to initially comply with Chapter 74's notice and medical authorization requirements.

In the absence of any authority in support of her "self-abatement" argument, Ms. Reid urges that "it is not reasonable to expect that there will be any filing with any court or any Rule 11 agreement before the triggering of 74.052(a)." Open. Br. at 11. Ms. Reid's argument simply belies the fact that numerous cases—including several cases referenced in Appellant's Brief—addressing whether abatement can extend the expert report deadline implicated an order of abatement entered by the court. *See, e.g.*, *Carreras*, 339 S.W.3d at 70 (Tex. 2011) (trial court granted plea

in abatement); *Hagedorn*, 73 S.W.3d at 347 (trial court entered agreed order of abatement); *Permanente Med. Assoc. of Tex. v. Johnson*, 917 S.W.2d 515, 516 (Tex. App.—Waco 1996, no writ) (trial court granted plea in abatement); *Lim v. West*, No. 01-08-00469-CV, 2008 WL 4670991, at *2 (Tex. App.—Hous. [1st Dist.] Oct. 23, 2008, pet. denied) (mem. op.) (trial court entered agreed order of abatement).

**B.  An Abatement Cannot Alter Ms. Reid's Deadline to Serve an Expert Report**

Even assuming Ms. Reid unilaterally abated the case by her belated provision of notice and authorization, Texas case law is clear that service of a pre-suit notice with authorization after a lawsuit is filed and after the defendants have answered does not toll or extend the 120-day period for service of the expert report, regardless of whether it achieves a 60-day abatement. *See, e.g.*, *McWashington v. Harris County Hosp. Dist.*, 208 S.W.3d 64, 69 (Tex. App.—Hous. [14th Dist.] 2006, no pet.) (abatement of case under TEX. CIV. PRAC. & REM. CODE § 74.052(a) does not toll or extend 120-day period for filing expert report); *Hagedorn*, 73 S.W.3d at 347-49 (without agreement to extend time to serve expert report, agreed abatement on plaintiff's failure to provide 60 days written notice of claim did not affect deadline to serve the report).  Therefore, despite the fact that Ms. Reid ultimately provided a notice letter and authorization, the 120-day expert

report deadline continued to run and then expired on January 4, 2016, without Ms. Reid ever having timely served the requisite report on Dr. Breen or Seton. RR 37.

Ms. Reid erroneously contends that, assuming abatement occurred, the issue for this Court is whether an expert report was due during the abatement period. Open. Br. at 16-21 (section entitled "No Expert Report Due During Abatement of Suit"); *id.* at 16 ("Thus the question remaining as a matter of law is whether an expert report is required to be filed for a lawsuit in abatement."); *id.* at 21 ("Plaintiff only asserts that by sending the notice and authorization, her lawsuit was abated; and that during an abatement of the suit, there is no requirement that she file her expert report."). However, the applicable issue here, if any, is whether an abatement of the suit would have tolled or extended the 120-day deadline for Ms. Reid to serve the expert report required by Section 74.351(a). Therefore, any arguments by Ms. Reid regarding whether any proceedings could occur during the purported abatement period or whether an expert report could be served during a period of abatement are entirely irrelevant to this case, and should be rejected by the Court.

### 1. Abatement under Section 74.052(a) does not toll or extend the 120-day deadline.

Numerous Texas courts have held that any abatement period following the belated service of notice and authorization under Section 74.052(a) does not toll or extend the statutory deadline for service of the expert report.

In *Hagedorn v. Tisdale*, a patient asserted a health care liability claim against his physician but failed to give the required pre-suit notice. 73 S.W.3d 341, 345 (Tex. App.—Amarillo 2002, no pet.). The defendant filed a plea in abatement, and the case was abated by agreed order under the predecessor of Section 74.051, for 60 days. *Id.* at 347. After the period of abatement ended, the plaintiff served an expert report past the 180-day expert report deadline. *Id.* (citing TEX. REV. CIV. STAT. art. 4590i, § 13.01(d) (repealed)). The trial court dismissed the case, finding that the report was not timely served. *Id.* at 345.

On appeal, the plaintiff made the same argument as Ms. Reid here. *Id.* at 347 ("[Plaintiff] contends the abatement left him with no power to prosecute his claims, and he could not have filed his report during the time of abatement. However, we note that [plaintiff] still had almost three months after the abatement ended to file his report. Thus, the issue for determination is whether the abatement extended the time period."). The Amarillo Court of Appeals acknowledged that abatement is often considered a suspension of all proceedings in a lawsuit, but noted that certain actions may be taken during an abatement, such as the joinder of parties and the dismissal of the cause of action. *Id.* (citations omitted). The court also noted that the "effect of the abatement is to keep the ***defendant*** free of litigation during the abatement period." *Id.* at 348 (citing *Am. Online, Inc. v.*

*Williams*, 958 S.W.2d 268, 277 (Tex. App.—Hous. [14th Dist.] 1997, no pet.)) (emphasis added).

The court then focused on the purpose of Article 4590i, the predecessor to Chapter 74, which was "to curtail frivolous claims against physicians and other health care providers." *Id.* In light of the purpose of Article 4590i, the court reasoned that to extend the time to serve expert reports because of a plaintiff's failure to comply with the pre-suit notice requirement would reward the plaintiff for not complying with the law. *Id.* The court noted that the resulting Hobson's choice for defendants was unacceptable:

> [A] health care provider would be placed in the position of having to choose whether to seek an abatement for the failure of the plaintiff to give him the statutorily required 60-day notice or to hold the plaintiff to the statutorily required deadline for filing the expert report. We cannot believe that the intent of the legislature to discourage frivolous lawsuits and encourage settlement of claims would be served by such a construction, since the legislature has determined that failing to timely file an expert report means that the claim is either frivolous or at best has been prematurely brought.

*Id.* (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001)).

The court further "fail[ed] to see how the claimant is damaged by being required to adhere to the statutory requirement[,]" noting that the plaintiff "to some extent chooses when to file his lawsuit and, at the time of filing, knows he has 180 days to serve his expert medical report." *Id.* Accordingly, the court held that the

abatement did not extend the plaintiff's deadline for providing expert reports, and affirmed the trial court's dismissal. *Id.* at 349, 354.

Ms. Reid criticizes any reliance on *Hagedorn* because that "court reached no decision as to whether a medical expert report could be filed during the abatement period if the 180 day deadline occurred during that time." Open. Br. at 20. But the question for the *Hagedorn* Court—whether an intervening abatement tolled the deadline to file an expert report where the deadline fell outside of the abatement period—is precisely the question for consideration here. And the court in *Hagedorn* concluded the expert report was untimely because it was filed after the 180-day period (as required under Section 74.351's predecessor statute) had run, despite the fact that a portion of the 180-day period was abated. *Hagedorn*, 73 S.W.3d at 349.[3]

Similarly, in *Emeritus Corporation v. Highsmith*, the trial court abated the lawsuit for 60 days after the plaintiff failed to provide the defendants with the statutorily required pre-suit notice under Section 74.051(a). 211 S.W.3d 321, 324 (Tex. App.—San Antonio 2006, pet. denied). Because the court's order simply abated the case "until 60 days from the date [defendant] receive[d] notice of a

---

[3] Appellant states that *Hagedorn* "explicitly states that even after the abatement, the plaintiff failed to file the report although he had three months to do so." Open. Br. at 20. Though the plaintiff in *Hagedorn* had slightly less than three months to file, *see Hagedorn*, 73 S.W.3d at 341, Dr. Breen and Seton agree that the plaintiff in that case had time after the abatement period ended in which to comply with the expert report deadline, much like Appellant would have had here if abatement actually occurred.

- 26 -

health care claim . . . and authorization[,]" without specifying a specific date for the conclusion of the abatement period, the parties agreed that the abatement period would end on a specific date. *Id.* The plaintiff's deadline to serve an expert report fell after the period of abatement ended, but the plaintiff failed to serve a report by this date. *Id.* The trial court denied the defendants' motion to dismiss, and instead retroactively granted an extension for the plaintiff to comply with Chapter 74's expert report deadline. *Id.* at 325.

The San Antonio Court of Appeals reversed the trial court's decision, finding that "an agreement to abate a case to permit a plaintiff to comply with the sixty-day notice requirement does not in and of itself extend the time for serving an expert report." *Id.* at 330. The court found persuasive the *Hagedorn* court's reasoning that a plaintiff should neither be rewarded for failing to comply with Chapter 74's pre-suit notice requirements, nor would a plaintiff be damaged by being required to adhere to the statutory requirement to timely serve expert reports. *Id.* at 329-30 (citing *Hagedorn*, 73 S.W.3d at 348). The court in *Emeritus* concluded that if "a plaintiff wants an extension of time, it must either enter an explicit written extension agreement with the defendant or assume the risk of serving a deficient report and seeking an extension to cure the deficiency from the trial court." *Id.* at 330. Because the plaintiff did neither, the court held the "trial

court was ***required*** to dismiss [plaintiff's] health care liability claims with prejudice." *Id.* (emphasis added).

In *McWashington v. Harris County Hospital District*, the Fourteenth Court of Appeals rejected the plaintiff's argument that the case should have been abated for a 60-day period due to her failure to provide a proper medical authorization form and that her deadline to serve an expert report was extended correspondingly. 208 S.W.3d at 69. Without deciding whether the plaintiff effectively abated the case, the court held that "an abatement of the proceedings under Section 74.052(a) does not toll or extend the 120-day period for filing an expert report[,]" *id.* (citing *Emeritus*, 211 S.W.3d at 327), and echoed the concerns expressed by the *Emeritus* and *Hagedorn* courts that to hold otherwise would reward the plaintiff with additional time to comply with Chapter 74's expert report deadline by his failure to comply with the statutory notice requirement. *Id.* (citing *Emeritus*, 211 S.W.3d at 327; *Hagedorn*, 73 S.W.3d at 348).

Finally, in *Gulf Coast Medical Center, LLC v. Temple*, one of several defendants filed a notice of abatement stating that "all further proceedings against this defendant in this matter are hereby ABATED for a period of 60 days following receipt of the required authorization by this Defendant." No. 13-09-00350-CV, 2010 WL 196972, at *4 (Tex. App.—Corpus Christi-Edinburgh Jan. 21, 2010, no pet.) (mem. op.). The trial court did not enter an order of abatement, nor did the

other defendants request, receive, or agree to any abatement in the case. *Id.* at *5. The plaintiffs' expert report deadline fell within the 60-day period following the filing of the notice of abatement, and the defendants moved to dismiss, which the trial court denied. *Id.* at *1.

The Thirteenth Court of Appeals reversed. *Id.* at *5. Assuming, without deciding, that abatement occurred and the abatement applied to all parties to the suit, the court "nevertheless conclude[d] that such an abatement does not serve to toll or extend the 120-day expert report deadline." *Id.* (citing *Emeritus*, 211 S.W.3d at 330; *McWashington*, 208 S.W.3d at 69; *Hagedorn*, 73 S.W.3d at 348-49). In so holding, the court in *Gulf Coast* found persuasive the *Hagedorn* court's reasoning that "the legislature could not have intended to allow plaintiffs to benefit by their failure to comply with the notice and authorization requirements." *Id.* (citing *Hagedorn*, 73 S.W.3d at 348).

The reasoning behind *Hagedorn* and its progeny is particularly applicable here, where Ms. Reid not only wholly failed to comply with Section 74.051 and 74.052's notice requirements, but claims that due to such failure, she can extend the expert report deadline by unilaterally abating the case. Thus, if Ms. Reid's logic were employed, any time a plaintiff failed to comply with Chapter 74's pre-suit notice and medical authorization requirements, the plaintiff could unilaterally engage a 60-day extension to serve expert reports upon service of the notice and

- 29 -

medical authorization form within 120 days of the filing of the defendant's answer. Unless statute of limitations were at issue,[4] there would be no consequences for failing to comply with Sections 74.051 and 74.052. By utilizing this self-serving procedural mechanism, a plaintiff would avoid any repercussion in the event he or she was unable to serve an expert report within 120 days of the filing of a defendant's answer. Such a distorted result could not be one intended by the drafters of the notice and authorization requirements, nor one condoned by this Court. *See Carreras*, 339 S.W.3d at 68 ("We . . . interpret statutes to avoid an absurd result." (citing *City of Rockwall*, 246 S.W.3d at 625-26)).

### 2. There is no written agreement to extend the expert report deadline.

There is only one statutory exception to the 120-day expert report deadline. Under Texas Civil Practice & Remedies Code Section 74.351, the date for serving the expert report may be extended by written agreement of the affected parties. TEX. CIV. PRAC. & REM. CODE § 74.351(a).

Ms. Reid can point to no written agreement by the parties to extend the expert report deadline. Instead, she relies solely upon the purported stipulation contained in her notice letter that the notice was "intended to abate the lawsuit for

---

[4] As stated above, under Texas Civil Practice & Remedies Code Section 74.051(c), proper pre-suit notice results in the tolling of the applicable statute of limitations for a period of 75 days following the provision of notice.

sixty days after [Appellees'] receipt of this letter in accordance with the relevant rules[,]" CR 76, as evidence that all proceedings in the lawsuit were abated and that such abatement extended the expert report deadline. Notwithstanding the fact that nowhere in the notice letter did Ms. Reid reference an extension of the expert report deadline, the argument regarding the stipulation of an abatement effectuating an extension of the deadline fails because the purported stipulation was unilateral.

Pursuant to Rule 11 of the Texas Rules of Civil Procedure, "no agreement ***between attorneys or parties*** touching on any suit pending will be enforced unless it be in writing, ***signed and filed with the papers as part of the record***, or unless it be made in open court and entered of record." TEX. R. CIV. P. 11 (emphasis added). Here, because there was no agreement ever made between the attorneys touching upon this lawsuit, logically the record fails to reflect the existence of a Rule 11 agreement regarding an extension of the Chapter 74 expert report deadline pursuant to Section 74.351(a) or the filing of such an agreement or stipulation with the court by any party. Ms. Reid's counsel's unilateral statement that Ms. Reid's pleading defects were cured by the service of the notice letter and that the lawsuit was abated for 60 days is of no legal consequence with respect to the 120-day expert report deadline. *See Emeritus*, 211 S.W.3d at 329 (holding that a unilateral understanding is not an agreement between the parties).

Even if the parties had executed a Rule 11 Agreement or had obtained an agreed order from the trial court reflecting an agreement that the case would be abated after Ms. Reid provided a notice letter and medical authorization, any such agreement or order would not effectively extend the expert report deadline in the absence of explicit language indicating the parties' intention to extend the deadline. *See, e.g.*, *Spectrum Healthcare Res. v. McDaniel*, 306 S.W.3d 249, 254 & n.5 (Tex. 2010) (holding that for an agreed order or written agreement to extend the section 74.351 threshold expert report deadline, the order "must explicitly indicate the parties' intention to extend the deadline and reference that specific deadline" to be effective); *Brock v. Sutker*, 215 S.W.3d 927, 929 (Tex. App.—Dall. 2007, no pet.) (scheduling order that did not address expert report deadline did not extend expert report deadline). What is more, Ms. Reid's unilateral "stipulation" regarding abatement made ***no*** reference to the expert report deadline at all, let alone any statement regarding Ms. Reid's counsel's purported belief that the belated provision of the notice letter and medical authorization extended the expert report deadline. Thus, there is absolutely no showing by Ms. Reid that she was entitled to any extension of the expert report deadline based on any agreement or stipulation by the parties.

### 3.     *Lim v. West* is inapposite to this case.

Ms. Reid relies on the First Court of Appeals' decision in *Lim v. West* as the only authority ostensibly in support of her contention that an abatement can serve to extend Section 74.351's expert report deadline.  Open. Br. at 20 (citing *Lim*, 2008 WL 4970991).  In an entirely false characterization, Ms. Reid contends that, in *Lim*, the court stated "that the trial court's decision to grant defendant's motion to dismiss based on Plaintiff's failure to file an expert report during the period of abatement was abuse [sic] of discretion." *Id.*  But in *Lim,* the trial court ***denied*** the defendant's motion to dismiss, and the First Court of Appeals considered whether the denial of the motion to dismiss constituted an abuse of discretion.  *Lim*, 2008 WL 4970991, at *1.  Further, contrary to Ms. Reid's contention, the court in *Lim* never held that "if the time period falls within the period of abatement, no expert report is due." Open. Br. at 20.

In *Lim*, the plaintiff filed a health care liability claim against his physician, but failed to provide a pre-suit medical authorization as required by Sections 74.051 and 75.052.  *Lim*, 2008 WL 4970991, at *1 & n.1. The defendant subsequently drafted an agreed order, which was signed by the parties and the trial court, to abate the case "in accordance with Chapter 74 of the Texas Civil Practice and Remedies Code." *Id.* at *1.  The expert report was due during the agreed period of abatement.  *Id.* at *1 n.1.  The plaintiff failed to serve an expert report

within the statutory deadline, and the defendant moved to dismiss. *Id.* at *1. At the hearing on the motion to dismiss, the defendant argued that the agreed abatement applied only to abate further proceedings against him under Section 74.052(a), but did not serve as a written agreement of the parties to extend the time to serve the expert report under Section 74.351(a). *Id.* The trial court denied the defendant's motion. *Id.*

On appeal, the First Court of Appeals considered the legal significance of the agreed order abating the case "in accordance with Chapter 74 of the Texas Civil Practice and Remedies Code." *Id.* The court noted that, therefore, *Lim* involved a different question than the question addressed by the courts in *Emeritus*, *McWashington*, and *Hagedorn*, all of which held that an abatement based **solely on Section 74.052(a)** did not affect the expert report deadline. *Id.* (citing *Emeritus*, 211 S.W.3d at 328-330; *McWashington*, 208 S.W.3d at 69; *Hagedorn*, 73 S.W.3d at 347-49).

Instead, the court in *Lim* considered whether the broad language of the agreed order entered by the trial court could "refer to the section 74.052(a) abatement, the section 74.351(a) agreed extension of time, or both." *Id.* at *2. In other words, the court in *Lim* considered whether the basis of the agreed order could have been a written agreement by the parties to extend the expert report deadline under Section 74.351(a). *Id.* Because of the absence of a reporter's

record or findings of fact, however, the court concluded that it could not dispense with the presumption that the trial court found all facts necessary to support its ruling, and was therefore unable to conclude that the trial court abused its discretion in denying the motion to dismiss. *Id.* (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

*Lim* is therefore clearly inapplicable to this appeal for several reasons. First, in contrast to the facts here and any suggestions by Ms. Reid to the contrary, *Lim* considered whether the expert report deadline was extended where the deadline fell ***during*** the period of abatement, *id.* at *1 n.1, not ***after the conclusion*** of any abatement period. Second, the only statutory exception to the expert report deadline—a written agreement of the parties to extend the deadline—was potentially at issue in *Lim* in light of the vague language of the parties' agreed order. *Id.* at *1-2. Here, it is undisputed that the parties never agreed to extend the deadline, whether written or otherwise, *see* RR 32 (MR. SARFO: "We have never asserted in any way that there was any agreement."), and that no order abating the case was ever entered. Open. Br. At 15 ("The statute . . . does not require any act on the part of the Plaintiff or Defendant to invoke the court's involvement for this abatement to apply.").

Third, the court in *Lim* simply found it was unable to conclude that the trial court abused its discretion in the absence of a sufficient record. *Lim*, 2008 WL

4970991, at \*2. Particularly in light of the presumption that the trial court found all facts necessary to support its ruling in the absence of a sufficient record, *see id.*, the holding in *Lim* is far from a pronouncement that "if the time period falls within the period of abatement, no expert report is due." Open. Br. at 20.

Finally, *Lim* was issued in 2008, two years before the Texas Supreme Court held in *Spectrum Healthcare* that an agreed order to extend an expert report deadline "must explicitly indicate the parties' intention to extend the deadline and reference that specific deadline" and that, "[o]therwise, the agreed order is ineffective to extend the section 74.351 deadline." *Spectrum Healthcare*, 306 S.W.3d at 254. Thus, to the extent *Lim* stood for the proposition that an agreed order abating a case "in accordance with Chapter 74 of the Texas Civil Practice and Remedies Code" could constitute an agreed extension of time to serve the expert report under Section 74.351(a), it has been implicitly overruled by the holding in *Spectrum Healthcare* that an agreed order to extend the expert report deadline "***must explicitly*** indicate the parties' intention to extend the deadline and reference that specific deadline." *Spectrum Healthcare*, 306 S.W.3d at 254 (emphasis added).

As the agreed order in *Lim* did not specifically reference Section 74.351 or any intention by the parties to extend the expert report deadline, the order would not have been effective to extend the expert report deadline under the current

*Spectrum Healthcare* standard and the trial court in *Lim* would have had no discretion but to grant the defendant's motion to dismiss. *See Drewery*, 344 S.W.3d at 507 ("Dismissal for failure to follow the mandates of section 74.351 is not discretionary."); *Lal v. Harris Methodist Fort Worth*, 230 S.W.3d 468, 476 (Tex. App.—Fort Worth 2007, no pet.) ("Appellant's failure to serve the expert report in a timely manner left the trial court with no discretion but to dismiss her claims with prejudice." (citing TEX. CIV. PRAC. & REM. CODE § 74.351(b)(2); *Etheredge v. McCarty*, No. 05-05-00164-CV, 2006 WL 1738258, at *1 (Tex. App.—Dall. June 27, 2006, no pet.) (mem. op.))). Accordingly, Ms. Reid's reliance on *Lim* is entirely misplaced.

### 4. A "prejudice" analysis is inappropriate.

Devoid of any authority in support of Ms. Reid's argument that her belated provision of notice and a medical authorization extended the expert report deadline, Ms. Reid apparently invites this Court to engage in a "prejudice" analysis, arguing that whether "one files the lawsuit before the notice and medical authorization or soon thereafter is of no consequence because the waiting period and the time for the filing of the expert report will still be the same 180 days." Open. Br. at 17. This argument, of course, ignores the fact that 180 days from the filing of her lawsuit is February 6, 2016, almost two months before April 4, 2016, the date Ms. Reid claims her expert report was due. Open. Br. at 12.

- 37 -

Regardless, Section 74.351 does not afford a plaintiff 180 days between the filing of a health care liability claim and the filing of an expert report, and was specifically amended to change the deadline from 180 days from the date the lawsuit was filed to 120 days from the date the defendant filed its answer. *See Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011) ("Article 4590i required that the expert report be 'furnished' to opposing counsel within 180 days of filing suit, but Chapter 74 shortened the deadline to 120 days and now requires the claimant to 'serve' (rather than 'furnish') the expert report 'on each party or the party's attorney.'" (citing TEX. CIV. PRAC. & REM. CODE § 74.351(a); TEX. REV. CIV. STAT. art. 4590i, § 13.01(d)(1) (repealed))).

More importantly, however, whether Dr. Breen or Seton were harmed or prejudiced by Ms. Reid's failure to serve an expert report by January 4, 2016 is not the applicable standard, as the trial court "has ***no discretion*** but to dismiss" a plaintiff's claims with prejudice for failure to timely serve expert reports. *Lal*, 230 S.W.3d at 476 (citing TEX. CIV. PRAC. & REM. CODE § 74.351(b)(2); *Etheredge*, 2006 WL 1738258, at *1) (emphasis added); *see also Drewery*, 344 S.W.3d at 507. The 120-day deadline is analogous to a statute of limitations in that it requires the plaintiff to file a sufficient expert report and expert's curriculum vitae within a fixed deadline or face mandatory dismissal with prejudice of their claims. *See, e.g.*, *Estate of Allen ex rel. Allen v. Scott & White Clinic*, No. 03-08-00576-CV,

2011 WL 2993259, at *1 (Tex. App.—Austin July 22, 2011, no pet.) (mem. op.), *abrogated on other grounds by CHCA Woman's Hosp., L.P. v. Lidji*, 403 S.W.3d 228, 232 (Tex. 2013) ("By enacting [the expert report deadline], the legislature created 'a statute of limitations type deadline within which expert reports must be served." (quoting *Ogletree v. Matthews*, 262 S.W.3d 316, 319 (Tex. 2007))); *Gajewski v. Jackson*, 351 S.W.3d 608, 612 (Tex. App.—El Paso 2011, no pet.) ("[T]he 120-day deadline has become a 'statute-of-limitations-type deadline,' leaving trial courts with no discretion to recalculate a plaintiff's 120-day deadline." (quoting *Badiga v. Lopez*, 274 S.W.3d 681, 683 (Tex. 2009))).

One of the purposes for the Legislature's adoption of Section 74.351(a)'s expert report requirement was "to remove unwarranted delay and expense, to accelerate the disposition of non-meritorious cases, and to give hard-and fast deadlines for the serving of expert reports." *Intracare Hosp. N. v. Campbell*, 222 S.W.3d 790, 797 (Tex. App.—Hous. [1st Dist.] 2007, no pet.); *see also Mokkala v. Mead*, 178 S.W.3d 66, 74-76 (Tex. App.—Hous. [14th Dist.] 2005, pet. denied), *abrogated on other grounds by Lidji*, 403 S.W.3d at 232 (citing Section 74.351's legislative history to demonstrate that expert report requirement was intended to serve Chapter 74's dual purposes of reducing excessive frequency and severity of health care liability claims and decreasing the cost of those claims). Therefore, any construction of Section 74.351(a) that would allow a plaintiff to toll the 120-day

deadline for serving an expert report for a minimum of 60 days by belatedly providing notice and a medical authorization form would eviscerate the deadline and fatally undermine Chapter 74's underlying purpose. *See HCBeck, Ltd.*, 284 S.W.3d at 352.

In recodifying the prior version of the expert report requirement (set forth in TEX. REV. CIV. STAT. art. 4590i) in Section 74.351(a), the Legislature pointedly removed the provision previously authorizing courts to extend the deadline for serving expert reports absent written agreement of the parties. *Mokkala*, 178 S.W.3d at 75-76. Ms. Reid, in essence, is requesting this Court to create an exception to Section 74.351(a)'s absolute 120-day deadline for serving an expert report where the plaintiff failed to comply with Chapter 74's pre-suit notice and medical authorization requirements but subsequently provided notice and an authorization form after filing suit. This Court should decline that invitation and apply Section 74.351(a) as it is written. *See Vick v. Rangel*, No. 04-05-00362-CV, 2005 WL 2438375, at *1 (Tex. App.—San Antonio Oct. 5, 2005, no pet.) (mem. op.) ("[C]rafting an exception to the 120 day deadline is within the province of the Legislature, not this court").

Here, no report was timely served by Ms. Reid and there is no expert report in the record containing any of the elements required under the statute. *See Scoresby v. Santillan*, 346 S.W.3d 546, 557 (Tex. 2011). Therefore, because Ms.

Reid failed to meet the requirements of Texas Civil Practice & Remedies Code § 74.351(r)(6), the trial court had no discretion but to statutorily dismiss her claims against Dr. Breen and Seton with prejudice. TEX. CIV. PRAC. & REM. CODE § 74.351(b); *Ogletree*, 262 S.W.3d at 319-20 ("If no report is served within the 120 day deadline provided by 74.351(a), the Legislature denied trial courts the discretion to deny motions to dismiss or grant extensions . . . ." (citing TEX. CIV. PRAC. & REM. CODE § 74.351(b))).

## III. The Trial Court Did Not Err by Declining to Enter Findings of Fact and Conclusions of Law

Ms. Reid argues that the trial court erred by refusing to file findings of fact and conclusions of law "because in a medical malpractice case in which a Rule [sic] 74 Motion to dismiss is granted, a request for Findings of Fact and Conclusions of Law should be filed when requested." Open. Br. at 22 (citing *Mocega v. Urquhart*, 79 S.W.3d 61 (Tex. App.—Hous. [14th Dist.] 2002, pet. denied). As a result of the trial court's refusal to enter findings of fact and conclusions of law, Ms. Reid contends she was harmed because she "has no knowledge of the facts and grounds upon which her lawsuit was abridged." *Id.* Ms. Reid's contentions are belied by well-established precedent and the record in this case.

**A.  Findings of Fact and Conclusions of Law Are Not Required For Dismissals Under Section 74.351**

Texas courts have repeatedly held that a trial court is not required to enter findings of fact and conclusions of law when dismissing a health care liability claim for the plaintiff's failure to comply with Chapter 74's expert report requirements.  *See, e.g.*, *Davis*, 171 S.W.3d at 413-14 (holding trial court did not abuse its discretion in declining to file findings of fact and conclusions of law after dismissal of case under predecessor to Section 74.351); *Smalling v. Gardner*, 203 S.W.3d 354, 371-72 (Tex. App.—Hous. [14th Dist.] 2005, pet. denied) (same); *Mocega*, 79 S.W.3d at 64 (holding that trial court did not err in refusing to file findings of fact and conclusions after dismissal of case under predecessor to Section 74.351 and stating that "findings of fact and conclusions of law are appropriate but not required."  (citing *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 442-43 (Tex. 1997); *Tomasi v. Liao*, 63 S.W.3d 62, 64-65 (Tex. App.—San Antonio 2001, no pet.))).

Beyond the context of health care liability claims, the Texas Supreme Court has held that in cases other than those finally adjudicated after a conventional bench trial on the merits, "findings and conclusions are proper, but a party is not entitled to them."  *IKB Indus.*, 938 S.W.2d at 442; *see also Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 580 (Tex. App.—Hous. [14th Dist.] 2004, no pet.) ("[F]indings of fact are not required in an abuse of discretion review."  (citing

- 42 -

*Crouch v. Tenneco, Inc.*, 853 S.W.2d 643, 646 (Tex. App.—Waco 1993, writ denied))). Even where a trial court may otherwise be required to make findings of fact and conclusions of law, a trial court is not required to make findings of fact as to undisputed facts. *See Barker v. Eckman*, 213 S.W.3d 306, 310 (Tex. 2006) ("[F]act findings are not necessary when the matters in question are not disputed." (citing *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971))); *SMI/USA, Inc. v. Profile Techs., Inc.*, 38 S.W.3d 205, 209 (Tex. App.—Waco 2001, no pet.) ("[T]he trial court is not required to make findings of fact as to undisputed facts." (citations omitted)).

Findings of fact and conclusions of law are not required after a Chapter 74.351 dismissal for two reasons. First, findings of fact and conclusions of law are "often unnecessary;" therefore, "requiring them in every case would unduly burden trial courts." *Smalling*, 203 S.W.3d at 371-72 (citing *IKB Indus.*, 938 S.W.2d at 442). Second, appellate courts are not required to give the trial court's findings the same level of deference as is required following a bench trial on the merits. *See IKB Indus.*, 938 S.W.2d at 442.

Ms. Reid cites *Mocega* for the proposition that findings of fact "are helpful when the court dismisses a plaintiff's suit for filing of [sic] late (or no) report[,]"[5] Open. Br. at 23, but fails to mention that the court in *Mocega*—in the same

---

[5] The court in *Mocega* used the word "appropriate," not "helpful." *Mocega*, 79 S.W.3d at 64.

sentence as its statement that findings of fact and conclusions of law are appropriate for a dismissal under the predecessor to Section 74.351—held that such findings of fact and conclusions of law are not required. *Mocega*, 79 S.W.3d at 64. When viewed in context, *Mocega* stands for the simply unremarkable position that the filing of findings of fact and conclusions of law may be appropriate in certain circumstances, but that a trial court does not err by declining to do so. *See id.*

Although Ms. Reid cites no other authority for the proposition that a trial court errs by declining to file findings of fact and conclusions of law after ruling on a motion to dismiss under Chapter 74, she cites *Tenery v. Tenery* for the proposition that when a court declines to file findings of fact and conclusions of law in response to a party's request, "the failure is presumed harmful on appeal unless the record affirmatively shows that the party suffered no injury." 932 S.W.2d 29, 30 (Tex. 1996). Ms. Reid fails to mention, however, that *Tenery* involved a trial court's division of marital assets, subject to a Texas Family Code provision requiring the entry of findings of fact in certain circumstances applicable to that case, *see id.* (citing TEX. FAM. CODE § 154.130(a)(3); *Chamberlain v. Chamberlain*, 788 S.W.2d 455, 455 (Tex. App.—Hous. 1990, writ denied)), and does not fall within the category of cases—like this one—in which the Texas

Supreme Court has held do not require findings of fact and conclusions of law. *IKB Indus.*, 938 S.W.2d at 442.

Ms. Reid has cited no authority for the novel proposition that, even though the trial court has no duty to file findings of fact and conclusions of law in this circumstance, the trial court's decision to decline to file such findings and conclusions is presumed harmful unless the record affirmatively shows the party suffered no injury. In fact, this proposition is contradicted by applicable case law. *See Sandles v. Howerton*, 163 S.W.3d 829, 834 & n.5 (Tex. App.—Dall. 2005, no pet.) (declining to presume harm from trial court's failure to issue findings of fact and conclusions of law where findings were not required for dismissal under predecessor statute to Section 74.351).

Consistent with the holdings in *IKB* Industries, *Davis*, *Smalling*, and *Mocega*, the trial court did not err in declining to file findings of fact and conclusions of law, particularly in light of the fact that the key facts in this case are not disputed. *See Barker*, 213 S.W.3d at 310.

## B. Alternatively, the Record Thoroughly Indicates the Bases of the Trial Court's Decision

Alternatively, assuming the trial court was required to file findings of fact and conclusions of law, the failure to do so "is not harmful error if the record before the appellate court affirmatively shows that the complaining party suffered no injury." *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989).

Ms. Reid's assertion that she was harmed because she "has no knowledge of the facts and grounds upon which her lawsuit was abridged" is controverted by the record as well as Ms. Reid's own Brief. The record contains a 111-page Clerk's Record, CR 1-111, and a 56-page Reporter's Record. RR 1-56. The parties extensively briefed the issues before the trial court, CR 29-78, 82-85, and the trial court unequivocally indicated her understanding that the question for consideration was whether Ms. Reid's notice and medical authorization served to extend the expert report deadline:

> THE COURT: . . . But I'm going to read the cases to see if, by any stretch of the imagination, your -- what you communicated to counsel without any filing or without any written agreement between the parties pertaining to an abatement, if somehow I can still determine that, one, that there was a stay in place, and two, if there was somehow a stay in place based upon what you provided or what they included in their answer to you, that that stay allowed you to not file your expert report.

RR 51.

Moreover, Ms. Reid's Opening Brief demonstrates her awareness of the legal questions on which the trial court based its decision, Open Br. at 13-21, and even summarizes two possible implicit legal conclusions that the trial court made by granting the Motion to Dismiss. *Id.* at 23 ("[T]he Court erred by implicitly finding that plaintiff's suit was not in abatement, or that a lawsuit in abatement still requires the filing of an expert report because there is no evidence or, in the alternative, insufficient evidence to support that finding."). It being undisputed

that Section 74.351 requires the service of an expert report within 120 days of the filing of a defendant's answer absent an exception, Ms. Reid's brief addresses whether the belated provision of notice and authorization effectively abated the suit, and if so, whether such abatement served to extend the expert report deadline. *Id.*

That the trial court did not make explicit findings regarding both questions is of no moment, as Ms. Reid addressed the issues relevant to either possibility in her Brief. *In re J.I.T.P.*, 99 S.W.3d 841, 849 (Tex. App.—Hous. [14th Dist.] 2003, no pet.) (holding appellant was not harmed by trial court's decision not to file findings and conclusions where there was a complete reporter's record and appellant was able to brief, and the appellate court was able to fully review, whether the judgment was supported by legally and factually sufficient evidence under standard applicable to involuntary termination proceedings). Tellingly, Ms. Reid has failed to identify any issue that she has not been able to brief because of the trial court's decision to decline to file findings of fact and conclusions of law. *Cf. Watts v. Oliver*, 396 S.W.3d 124, 131 (Tex. App.—Hous. [14th Dist.] 2013, no pet.) (holding appellant was not forced to guess the grounds of the trial court's decision where he addressed issues related to alternate possible grounds of trial court's decision and where he was unable to identify any issue that he was unable to brief due to the trial court's decision not to file findings and conclusions).

**C. The Proper Remedy for Error, if Any, is to Abate the Appeal to Allow the Entry of the Missing Findings**

Even if this Court were to conclude that Ms. Reid was not only entitled to findings of fact and conclusions of law entered by the trial court, but that the trial court's decision not to file such findings and conclusions caused injury, the proper remedy is not to reverse the trial court's judgment, but to abate the appeal and remand the case to the trial court to make findings of fact and conclusions of law. *See* TEX. R. APP. P. 44.4; *Busch v. Hudson & Keyse, LLC*, 312 S.W.3d 294, 298 (Tex. App.—Hous. [14th Dist.] 2010, no pet.) ("If proper presentation of a case on appeal is prevented by a trial court's failure to make requested findings of fact and conclusions of law, the proper remedy is to abate the appeal and direct the trial court to make findings and conclusions pursuant to [TEX. R. APP. P. 44.4(b)]." (citations omitted)). Accordingly, any error on the part of the trial court or harm caused by the trial court's decision to not file findings or conclusions requires abatement of the appeal and a remand to the trial court to make findings of fact and conclusions of law.

## CONCLUSION

For the reasons stated above, Dr. Breen and Seton respectfully request that this Court affirm the trial court's order granting Dr. Breen's and Seton's Motion to Dismiss with prejudice. Appellees further request all other relief to which they are entitled.

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

By:   /s/ Yvonne K. Puig
   Yvonne K. Puig
   State Bar No. 16385400
   yvonne.puig@nortonrosefulbright.com
   Daphne Andritsos Calderon
   State Bar No. 00796788
   daphne.calderon@nortonrosefulbright.com
   Eric J. Hoffman
   State Bar No. 24074427
   eric.hoffman@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

*Counsel for Appellees Seton Family of Hospitals and Michael Breen, M.D.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), the undersigned counsel – in reliance upon the word count of the computer program used to prepare this document – certifies that this brief contains 10,500 words, excluding the words that need not be counted under Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ *Daphne Andritsos Calderon*
Daphne Andritsos Calderon

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that a copy of Appellees' Response Brief on the Merits was served by electronic filing and electronic mail in compliance with Texas Rule of Appellate Procedure 9.5 on September 15, 2016, upon:

Mr. Samuel Adjei Sarfo
1703B Burton Drive
Austin, Texas 78741
lawyersarfo@yahoo.com
(Counsel for Appellant)


Mr.Tim Flocos
Brustkern, Flocos & Associates
611 West 14th Street, Suite 200
Austin, Texas 78701
tim@timflocos.com
(Counsel for Appellee Ann Czarnik, M.D.)


/s/ *Daphne Andritsos Calderon*
Daphne Andritsos Calderon

# INDEX TO APPENDIX

1. Trial Court's Order on Dr. Breen's and Seton's Motion to Dismiss

2. Notice and Medical Authorization Form provided by Ms. Reid to Seton

3. Notice and Medical Authorization Form provided by Ms. Reid to Dr. Breen

4. Texas Civil Practice & Remedies Code § 74.351

5. Texas Civil Practice & Remedies Code § 74.051

6. Texas Civil Practice & Remedies Code § 74.052

Appendix Tab 1

NO. D-1-GN-15-003300

| | | |
|---|---|---|
| MARGARET REID, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| SETON'S HOSPITALS, ET AL. | § | |
| | § | |
| | § | |
| Defendants. | § | 53rd JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANTS SETON FAMILY OF HOSPITALS AND MICHAEL BREEN, M.D.'S CHAPTER 74 MOTION TO DISMISS WITH PREJUDICE

ON THIS DAY the Court considered Defendants Seton Family of Hospitals and Michael Breen, M.D.'s Chapter 74 Motion to Dismiss with prejudice, the Plaintiff's response thereto, including Motion for Sanctions, arguments of counsel and the case file as a whole. The Court is of the opinion that the Motion to Dismiss is meritorious and should be granted. Accordingly,

IT IS HEREBY ORDERED that because no expert report was timely served by Plaintiff as against Defendants Seton Family of Hospitals or Michael Breen, M.D., Defendants Chapter 74 Motion to Dismiss with prejudice is GRANTED;

IT IS FURTHER ORDERED that because Defendants' Chapter 74 Motion to Dismiss was filed in good faith and is not groundless, Plaintiff's Motion for Sanctions pursuant to Rule 13 of the Texas Rules of Civil Procedure and Chapter 10 of the Texas Civil Practice and Remedies Code is DENIED;

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the above-styled and numbered cause be, and the same is, hereby DISMISSED with prejudice, as to Defendants SETON FAMILY OF HOSPITALS and MICHAEL BREEN, M.D., only, to the rights of the Plaintiff, with each party to bear their own costs.

- 1 -





SO ORDERED this the 4th day of February, 2016.



_____
JUDGE PRESIDING

APPROVED AS TO FORM ONLY:


_____
Samuel Adjei Sarfo
The Sarfo Law Firm

*Attorney for Plaintiff*



_____
Daphne Andritsos Calderon
Norton Rose Fulbright US LLP

*Attorneys for Defendants Seton Family of Hospitals
And Michael Breen, M.D.*

- 2 -

Appendix Tab 2

## THE SARFO LAW FIRM

## 7901CAMERON ROAD, SUITE 2-242, AUSTIN, TEXAS 78754

SAMUEL ADJEI SARFO    FAX: 512-523-5911        TELEPHONE: 512-297-0227

ATTORNEY AT LAW        OFFICE: 512-537-7121        lawyersarfo@yahoo.com

The Chief Executive Officer

Seton Hospital

17900 FM 1826

Austin, Texas 78737-1407


October 01, 2015

Dear Sir/Madam.

## NOTICE OF INTENT TO PROCEED WITH SUIT


## INTRODUCTION

As per Sec. 74.051 of the Texas Practice and Remedies Code, I Samuel Adjei Sarfo, Esq. write on behalf of my client Margaret Reid to notify you of an intent to proceed with a medical malpractice suit already filed with the Travis County District court.

Accompanying this notice is also a medical authorization form executed by the claimant in the form required by Section 74.052 of the Code.


## FACTS

Around July of 2014, petitioner, Mrs. Margaret Reid who had been experiencing some discomfort around her pelvic area for the prior six months, was advised by her Pre-Medicare Physician (PCP), Dr. Terri Bagwell, to have an ultra sound exam. After the exam, petitioner was found to have cyst in her ovaries, and two small fibroids in her uterus, in addition to symptoms akin to that of endometriosis. As a result, Dr. Terri Bagwell referred her to a specialist surgeon called Dr. Michael Breen. Dr. Breen gave petitioner appointment for evaluation on January 26, 2015.

But on January 12, 2015, petitioner experienced a severe abdominal pain around her pelvic area and called 911 which took her to the St. David's Hospital. At the hospital, they did the test and discovered that petitioner had a raptured cyst. She was therefore advised to see an OBGYN as soon as possible. Petitioner therefore called Dr. Michael Breen and impressed on him to see her earlier before January 26. Petitioner was able to see Dr. Breen on January 14, 2015.

1

After examining petitioner on this date, Dr. Breen scheduled a surgery for total hysterectomy for petitioner on February 17, 2015. Consequently, Dr. Breen performed the said surgery on that date which involved the removal of petitioner's uterus, cervix, ovaries and other surrounding reproductive organs.

Dr. Breen stated to petitioner before the surgery on that day that if he found petitioner with too much scar tissue due to petitioner's previous surgeries, he was going to open petitioner up, but somehow, he later decided to maneuver the previous scar area without opening up petitioner. He therefore went ahead to perform the surgery, which involved a maneuver of the previous scar areas without actually opening up petitioner's stomach. Petitioner stayed overnight at the hospital and was discharged the following day on February 18, 2015.

When petitioner arrived home that day, she began experiencing a lot of pain and bleeding, which she considered normal as per the doctor's post-surgery advice. But ten days after the surgery (i.e. on February 27, 2015), both the pain and the bleeding were elevated. Petitioner, who happens to be a nurse, also found out that the blood was issuing from the bladder, and not from the vagina, as the doctor advised.

Petitioner therefore tried to contact Dr. Breen to report her situation, but because it was after hours at 5.30. p.m., the doctor was not available; but the on-call doctor advised her to go to the emergency room at Seton Hospital as soon as possible. By the time she arrived at the emergency room, petitioner was also experiencing chest pain in addition to the bleeding and general pain. The nurse immediately took a specimen of her urine, which presented as virtual blood.

After some time, Dr. Ann Czarnik arrived and observed petitioner, who described her condition to the doctor and informed her of her recent surgery. The doctor then asked petitioner if she was sure the blood was issuing from the bladder, to which petitioner answered in the affirmative. The doctor then performed a pelvic exam after which she disclosed to petitioner that there was a collection of blood in the vagina, and therefore the blood was probably coming from the vagina, and not the bladder.

She also informed petitioner that she was going to order an x-ray of the chest to determine whether petitioner had pneumonia. After the chest x-ray was performed, the result came normal. Thereafter, the doctor ordered CT scan on petitioner's chest to determine whether there was any blood clot around petitioner's heart area. That scan also came out normal. After the chest x-ray and CT scan, there was no further test done on petitioner to determine where the blood was actually coming from. Instead, the doctor firmly informed petitioner that she was suffering from urinary tract infection (UTI).

At this time, petitioner had already been at the emergency room for three and half hours, during which time she had been given intravenous infusion and morphine because she was suffering from a lot of pain and discomfort. Around 9.00 p. m., Dr. Czarnik returned and asked petitioner whether she urinated blood again, to which petitioner responded in the affirmative that she had urinated blood three times but had flushed it off. At this point, Dr. Anne Czarnik told petitioner that she was waiting to seek advice from another doctor and left petitioner's side. But around 11.00 p.m., petitioner began to experience more extreme pain and went to the bathroom where she urinated excessive amounts of blood, whereupon she called the nurse assigned to her to come and see. The nurse, after seeing the blood, exclaimed, "Oh my God!" and rushed to call the doctor.

2

At this point in time, the doctor, without further ado, arrived with discharge forms to discharge petitioner. Petitioner prompted the doctor to go to the bathroom to observe the blood petitioner had urinated, but the doctor declined, stating that she did not have to see the bloody urine because the nurse already told her, but she was now certain petitioner was suffering from UTI. She further stated that she was going to start petitioner on some antibiotics (i.e. Cipro, 500 milligrams) and advised her to follow up with the doctor that performed her surgery two weeks previously. She also asked petitioner to see an urologist, based on her conclusion that petitioner had UTI.

Without further checks on petitioner despite petitioner's protestations, petitioner was duly discharged on February 28, 2015 on the orders of Dr. Ann Czarnik. When petitioner arrived home, she was in extreme pain but tried hard to sleep. However at 4.00 a.m., petitioner felt that her bladder was full and distended and went to the bathroom to try to urinate; but she could not. She also felt something hanging out from her vagina, and when she checked further, she discovered that it was blood clot traceable from the bladder. Petitioner construed this to mean that the blood was issuing from the bladder. Petitioner took a picture of this hanging blood clot.

She then called the hospital and asked to speak with Dr. Ann Czarnik, and when the operator asked for her reason, petitioner explained her condition to her, whereupon the operator advised her to come to the emergency room as soon as possible. Petitioner then headed straight with her husband to the emergency room on March 01, 2015. On her way to the hospital, petitioner felt weaker and weaker and was in a lot of pain and sweating all over. At the emergency room, she could hardly speak because of her condition. She was then placed in the care of another doctor called Dr. Dille who explained that she was taking over from Dr. Ann Czarnik. She then ordered for Foley Catheter to be inserted on petitioner to drain the urine which was now almost black. The quantity of the urine was 550 cc.

Dr. Dille then scanned petitioner's bladder and observed that there was some blood clot blocking the passage of the blood. She then immediately ordered a CT scan of the bladder. But before petitioner was transported to do the CT scan, Dr. Dille called another doctor who came and interviewed petitioner. After she listened to petitioner's full account of events as happened, she stated that Dr. Ann Czarnik must have caused petitioner extreme trauma. While talking to petitioner, another doctor also came over to listen to petitioner's account. The two doctors now invited another male doctor, and after conferring among themselves for some time, thereafter told petitioner that they were going to first perform a pelvic exam to find out whether the first doctor that performed the surgery might have poked the bladder while sewing petitioner up after the surgery.

They finally performed this pelvic exam and made a visual conclusion that the stitches were all intact and everything was healing well. But they repeated to petitioner their decision to do the CT scan. They then transported petitioner to the CT scan room where for some unknown reason, petitioner spent a whole forty-five minutes for a process that normally takes not more than twenty minutes. After they took petitioner back to the emergency room, the doctors disclosed to her that there was a hole in her bladder as a result of the surgery performed by Dr. Michael Breen.

Thereafter, plaintiff was informed that they were going to keep the Catheter for two weeks, and that she was going to be discharged immediately. But a good friend of the plaintiff who was also a nurse made a loud protest against the decision to discharge plaintiff because she observed that petitioner's urine was still dark. Thereafter the doctors immediately reversed their decision and secured a room for plaintiff who stayed on admission for a further three days.

For the entire time after the surgery spanning plaintiff's traumatic distress, he never set eyes on Dr. Michael Breen, the doctor that originally performed the total hysterectomy. However after her discharge was delayed, Dr. Michael Breen who was on call on that particular day (i.e. March 01, 2015) came and saw plaintiff, whereupon plaintiff reiterated that she was not leaving the hospital until she felt reasonably well. Dr. Breen concurred and informed plaintiff that she was being recommended to see a very good urologist called Dr. Singh Herb. The Doctor came to see plaintiff who explained to Dr. Herb her situation. Dr. Singh also wondered aloud how the ER doctor prematurely discharged plaintiff without finding out where the blood was coming from.

The following day, (i.e. on March 03, 2015), plaintiff was taken to the operation room and had general anesthesia done again. The doctor did not consider the five millimeter hole to be big enough for stitches and therefore left the catheter intact. Finally, plaintiff was discharged on March 03, 2015 and was given a lot of pain medication. When plaintiff went home, he started bleeding again after only three days. She called Dr. Singh who advised her to come to her clinic. She examined plaintiff the following day and advised her that her insurance did not cover for the visit but she was going to examine plaintiff for free on that particular day because he felt very sad about what happened. He then referred her to another urologist called Dr. Lorene Jones who was within her HMO network.

Before seeing Dr. Jones, plaintiff was invited by Dr. Michael Breen for a follow-up. He advised plaintiff that she needed a cystogram (a type of CT scan) to ensure that the hole was no more leaking. The procedure was so painful that plaintiff nearly stopped them. The results of that cystogram was thereafter faxed to Dr. Jones who inspected it and concluded that the hole in plaintiff's bladder had not healed and was still leaking, and that plaintiff therefore needed to keep the catheter on for another two weeks.

After two weeks, plaintiff had to endure another CT scan after which Dr. Lorene Jones discontinued the catheter on March 31, 2015.

## CAUSES OF ACTION

Plaintiff has brought a cause of action in negligence against Dr. Michael Breen. Dr. Michael Breen owed the duty of providing standard medical care to Ms. Margaret Reid during her hysterectomy surgery which involved the removal of petitioner's uterus, cervix, ovaries and other surrounding reproductive organs. Upon discovery of petitioner's manifold scar tissue due to prior surgery, this standard would have required the defendant to open petitioner up, as he himself stated to the understanding of petitioner prior to the operation. Dr. Michael Breen breached this standard when he maneuvered around the scar tissue, putting undue stress on petitioner's bladder region and leading to the physical injury of a tear in her bladder and thereby proximately causing her the damage and distress and pain and suffering.

This failure amounts to a breach of the applicable standard of medical care.

As a direct and proximate result of the breach of the applicable standard of medical care by the Defendant, the Plaintiff: i. suffered conscious pain and suffering both in the past and, it is expected by

her physicians, the future, ii. incurred medical expenses in the past and will incur future medical expenses, iii. suffered mental and emotional sorrow and anguish, iv. was required to undergo additional medical procedures and has sustained other damages.

That the initial bladder damage sustained by the Plaintiff was the direct and proximate result of the negligent actions and breaches of the applicable standards of medical care by the Defendant without any act or omission on the part of the Plaintiff directly thereunto contributing.

That the Plaintiff did not assume the risk of her injuries.

Plaintiff alleges that on or about February 17, 2015 and thereafter, Defendant Michael Breen breached the applicable standard of medical care owed to the Plaintiff Margaret Reid, which directly caused a physical injury to the Plaintiff and was the direct and proximate cause of the Plaintiff's injuries and damages.

WHEREFORE: The Plaintiff claims monetary damages against Michael Breen individually in an amount to be determined at trial, plus costs, and for any further relief that this Honorable Court determines necessary and appropriate.

Furthermore, Ms. Margaret Reid intends to proceed against Dr. Ann Czarnik in negligence. Dr. Ann Czarnik had a duty to provide a reasonable standard of medical care to petitioner as per their doctor-patient relationship. But defendant deviated from this standard of medical care during the care and treatment of the Plaintiff on or about February 28, 2015, when during care of plaintiff, she did not exercise acceptable standard of care in determining plaintiff's source of ailment, viz. where blood was issuing from and insisted that petitioner was suffering from urinary tract infection, despite that petitioner sufficiently described her condition to defendant.

Dr. Ann Czarnik deviated from the reasonable standard of medical care by her refusal to inspect the urine of petitioner despite having information that petitioner's urine was dark, and also by her premature discharge of petitioner. This deviation was the direct and proximate cause of a physical injury to the plaintiff and the direct and proximate cause of all of the plaintiff's consequent pain and suffering. WHEREFORE: plaintiff claims money damages against Dr. Ann Czarnik in an amount to be determined at trial, plus costs, and for any further relief that the Court determines necessary and appropriate.

Again, as to Dr. Ann Czarnik, plaintiff will proceed with a cause of action in intentional infliction of emotional distress (IIED).

Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 34 to 37 against second defendant Dr. Ann Czarnik and in addition, asserts a cause of action in Intentional Infliction of Emotional Distress ("IIED") against same.

The elements for a cause of action for IIED are as follows:

i. The plaintiff is a person. ii. The defendant acted intentionally or recklessly. iii. The emotional distress suffered by the plaintiff was severe. 4. The defendant's conduct was extreme and outrageous. iv. The

5

defendant's conduct proximately caused the plaintiff's emotional distress. v. No alternative cause of action will provide a remedy for the severe emotional distress caused by the defendant's conduct.

Kroger Tex. L.P. v. Suberu, 216 S.W.3d 788, 796 (Tex.2006); Hoffman-La Roche, Inc., v. Zeltwanger, 144, S.W.3d 438, 447 (Tex.2004); Tiller v. Mclure, 121 S.W.3d 709, 713 (Tex.2003).

Petitioner is a person who had a patient-doctor relationship with second defendant on whom she thereby entrusted her health. But defendant's action, from the onset was patently reckless, if not totally intentional. She initiated a battery of tests on petitioner and came up with her own misdiagnosis despite petitioner's protestations. She ignored the dignity and feelings of petitioner and the suggestion of nurses when she was called to come and see patient's urine, but instead, came with discharge papers and totally ignored petitioner's painful protestations.

Given the nature of defendant's conduct, it meets the threshold for being extreme and outrageous because of the level of sheer disregard for professional care and decorum for the petitioner, and her insistence in the face of plaintiff's denial that plaintiff was suffering from UTI. Defendant's action is the direct and proximate cause of plaintiff's distress.

Defendant is therefore liable to plaintiff for her emotional distress.

Given the severity of plaintiff's distress, no alternative cause of action would provide a remedy for the severe emotional distress caused by the defendant's conduct.
WHEREFORE: The Plaintiff claims monetary damages against Defendant Anne Czarnik in an amount to be determined at trial, plus costs, and for any further relief that this Honorable Court deems necessary and appropriate.


As to Seton Hospital, plaintiff will proceed in medical malpractice based on the theory of Respondeate Superior and/or Agency


This is because during all of the times that the plaintiff was receiving medical care and treatment from defendants Michael Breen M.D. and Ann Czarnik, MD, these defendants were employed by Seton Hospital, and that they were agents of their employer acting within the scope of their employment.

Thus Defendant Seton Hospital is responsible, via the theories of agency and respondeate superior for the breach of applicable medical care caused by their employees, the defendants herein, which resulted in a physical injury to the Plaintiff.

WHEREFORE: The Plaintiff claims monetary damages against Defendant Seton Hospital in an amount to be determined at trial, plus costs, and for any further relief that this Honorable Court deems necessary and appropriate.

## STIPULATION

We hereby stipulate, in response to the exception raised in your original answer to plaintiff's suit, that the plaintiff's lawsuit has been filed without prior notice to you and without furnishing you with a medical authorization form as required in 74.052 of the code.

This notice is therefore intended to cure that pleading defect. It is also intended to abate the lawsuit for sixty days after your receipt of this letter in accordance with the relevant rules.

It also tolls the applicable statute of limitations to and including a period of 75 days following the giving of the notice. This tolling shall apply to all parties and potential parties.

Please also note that all parties shall be entitled to obtain complete and unaltered copies of the patient's medical records from any other party within 45 days from the date of receipt of a written request for such records; provided, however, that the receipt of a medical authorization in the form required by Section 74.052 executed by the claimant herein shall be considered compliance by the claimant with this subsection.

## CONCLUSION

You may contact my office for any questions, concerns or proposals for possible settlement.

Thank you.

Respectfully submitted,

Samuel Adjei Sarfo

Texas Bar No.: 24071896

**ATTORNEY FOR MARGARET REID**

# AUTHORIZATION FORM FOR RELEASE OF PROTECTED HEALTH INFORMATION

A. I, Margaret Reid, hereby authorize Setons Hospital to obtain and disclose (within the parameters set out below) the protected health information described below for the following specific purposes:

1. To facilitate the investigation and evaluation of the health care claim described in the accompanying Notice of Health Care Claim; or

2. Defense of any litigation arising out of the claim made the basis of the accompanying Notice of Health Care Claim.

B. The health information to be obtained, used, or disclosed extends to and includes the verbal as well as the written and is specifically described as follows:

1. The health information in the custody of the following physicians or health care providers who have examined, evaluated, or treated Margaret Reid in connection with the injuries alleged to have been sustained in connection with the claim asserted in the accompanying Notice of Health Care Claim. (Here list the name and current address of all treating physicians or health care providers):

    1. Dr. Ann Czarnik

17900 FM 1896

Austin, Texas 78737-1407

    2. Dr. Michael Breen

17900 FM 1896

Austin, Texas 78737-1407

This authorization shall extend to any additional physicians or health care providers that may in the future evaluate, examine, or treat Margaret Reid (patient) for injuries alleged in connection with the claim made the basis of the attached Notice of Health Care Claim;

2. The health information in the custody of the following physicians or health care providers who have examined, evaluated, or treated Margaret Reid (patient) during a period commencing five years prior to the incident made the basis of the accompanying Notice of Health Care Claim.

(Here list the name and current address of such physicians or health care providers, if applicable.)

**Dr. Terri Bagwell**

**1710 Red River Street, Ste. 2104**

**Austin, Texas 78701**

1

C. Excluded Health Information--the following constitutes a list of physicians or health care providers possessing health care information concerning Margaret Reid to which this authorization does not apply because I contend that such health care information is not relevant to the damages being claimed or to the physical, mental, or emotional condition of Margaret Reid arising out of the claim made the basis of the accompanying Notice of Health Care Claim. (Here state "none" or list the name of each physician or health care provider to whom this authorization does not extend and the inclusive dates of examination, evaluation, or treatment to be withheld from disclosure.)

**NONE**

D. The persons or class of persons to whom the health information of Margaret Reid will be disclosed or who will make use of said information are:

1. Any and all physicians or health care providers providing care or treatment to Margaret Reid;

2. Any liability insurance entity providing liability insurance coverage or defense to any physician or health care provider to whom Notice of Health Care Claim has been given with regard to the care and treatment of Margaret Reid;

3. Any consulting or testifying experts employed by or on behalf of Seton Hospital.

4. Any attorneys (including secretarial, clerical, or paralegal staff) employed by or on behalf of Seton Hospital with regard to the matter set out in the Notice of Health Care Claim accompanying this authorization;

5. Any trier of the law or facts relating to any suit filed seeking damages arising out of the medical care or treatment of Margaret Reid.

E. This authorization shall expire upon resolution of the claim asserted or at the conclusion of any litigation instituted in connection with the subject matter of the Notice of Health Care Claim accompanying this authorization, whichever occurs sooner.

F. I understand that, without exception, I have the right to revoke this authorization in writing. I further understand the consequence of any such revocation as set out in Section 74.052, Civil Practice and Remedies Code.

G. I understand that the signing of this authorization is not a condition for continued treatment, payment, enrollment, or eligibility for health plan benefits.

H. I understand that information used or disclosed pursuant to this authorization may be subject to redisclosure by the recipient and may no longer be protected by federal HIPAA privacy regulations.

Signature of Patient

-----------------------------------------------------------------

MARGARET REID

10/5/15

2

Appendix Tab 3

## THE SARFO LAW FIRM

## 7901CAMERON ROAD, SUITE 2-242, AUSTIN, TEXAS 78754

SAMUEL ADJEI SARFO      FAX: 512-523-5911          TELEPHONE: 512-297-0227

ATTORNEY AT LAW          OFFICE: 512-537-7121       lawyersarfo@yahoo.com

Dr. Michael Breen

Seton Hospital

17900 FM 1826, Austin

Texas 78737-1407


October 01, 2015

Dear Sir,

### NOTICE OF INTENT TO PROCEED WITH SUIT


### INTRODUCTION

As per Sec. 74.051 of the Texas Practice and Remedies Code, I Samuel Adjei Sarfo, Esq. write on behalf of my client Margaret Reid to notify you of an intent to proceed with a medical malpractice suit already filed with the Travis County District court.

Accompanying this notice is also a medical authorization form executed by the claimant in the form required by Section 74.052 of the Code.


### FACTS

Around July of 2014, petitioner, Mrs. Margaret Reid who had been experiencing some discomfort around her pelvic area for the prior six months, was advised by her Pre-Medicare Physician (PCP), Dr. Terri Bagwell, to have an ultra sound exam. After the exam, petitioner was found to have cyst in her ovaries, and two small fibroids in her uterus, in addition to symptoms akin to that of endometriosis. As a result, Dr. Terri Bagwell referred her to a specialist surgeon called Dr. Michael Breen. Dr. Breen gave petitioner appointment for evaluation on January 26, 2015.

But on January 12, 2015, petitioner experienced a severe abdominal pain around her pelvic area and called 911 which took her to the St. David's Hospital. At the hospital, they did the test and discovered that petitioner had a raptured cyst. She was therefore advised to see an OBGYN as soon as possible. Petitioner therefore called Dr. Michael Breen and impressed on him to see her earlier before January 26. Petitioner was able to see Dr. Breen on January 14, 2015.

1

After examining petitioner on this date, Dr. Breen scheduled a surgery for total hysterectomy for petitioner on February 17, 2015. Consequently, Dr. Breen performed the said surgery on that date which involved the removal of petitioner's uterus, cervix, ovaries and other surrounding reproductive organs.

Dr. Breen stated to petitioner before the surgery on that day that if he found petitioner with too much scar tissue due to petitioner's previous surgeries, he was going to open petitioner up, but somehow, he later decided to maneuver the previous scar area without opening up petitioner. He therefore went ahead to perform the surgery, which involved a maneuver of the previous scar areas without actually opening up petitioner's stomach. Petitioner stayed overnight at the hospital and was discharged the following day on February 18, 2015.

When petitioner arrived home that day, she began experiencing a lot of pain and bleeding, which she considered normal as per the doctor's post-surgery advice. But ten days after the surgery (i.e. on February 27, 2015), both the pain and the bleeding were elevated. Petitioner, who happens to be a nurse, also found out that the blood was issuing from the bladder, and not from the vagina, as the doctor advised.

Petitioner therefore tried to contact Dr. Breen to report her situation, but because it was after hours at 5.30. p.m., the doctor was not available; but the on-call doctor advised her to go to the emergency room at Seton Hospital as soon as possible. By the time she arrived at the emergency room, petitioner was also experiencing chest pain in addition to the bleeding and general pain. The nurse immediately took a specimen of her urine, which presented as virtual blood.

After some time, Dr. Ann Czarnik arrived and observed petitioner, who described her condition to the doctor and informed her of her recent surgery. The doctor then asked petitioner if she was sure the blood was issuing from the bladder, to which petitioner answered in the affirmative. The doctor then performed a pelvic exam after which she disclosed to petitioner that there was a collection of blood in the vagina, and therefore the blood was probably coming from the vagina, and not the bladder.

She also informed petitioner that she was going to order an x-ray of the chest to determine whether petitioner had pneumonia. After the chest x-ray was performed, the result came normal. Thereafter, the doctor ordered CT scan on petitioner's chest to determine whether there was any blood clot around petitioner's heart area. That scan also came out normal. After the chest x-ray and CT scan, there was no further test done on petitioner to determine where the blood was actually coming from. Instead, the doctor firmly informed petitioner that she was suffering from urinary tract infection (UTI).

At this time, petitioner had already been at the emergency room for three and half hours, during which time she had been given intravenous infusion and morphine because she was suffering from a lot of pain and discomfort. Around 9.00 p. m., Dr. Czarnik returned and asked petitioner whether she urinated blood again, to which petitioner responded in the affirmative that she had urinated blood three times but had flushed it off. At this point, Dr. Anne Czarnik told petitioner that she was waiting to seek advice from another doctor and left petitioner's side. But around 11.00 p.m., petitioner began to experience more extreme pain and went to the bathroom where she urinated excessive amounts of blood, whereupon she called the nurse assigned to her to come and see. The nurse, after seeing the blood, exclaimed, "Oh my God!" and rushed to call the doctor.

At this point in time, the doctor, without further ado, arrived with discharge forms to discharge petitioner. Petitioner prompted the doctor to go to the bathroom to observe the blood petitioner had urinated, but the doctor declined, stating that she did not have to see the bloody urine because the nurse already told her, but she was now certain petitioner was suffering from UTI. She further stated that she was going to start petitioner on some antibiotics (i.e. Cipro, 500 milligrams) and advised her to follow up with the doctor that performed her surgery two weeks previously. She also asked petitioner to see an urologist, based on her conclusion that petitioner had UTI.

Without further checks on petitioner despite petitioner's protestations, petitioner was duly discharged on February 28, 2015 on the orders of Dr. Ann Czarnik. When petitioner arrived home, she was in extreme pain but tried hard to sleep. However at 4.00 a.m., petitioner felt that her bladder was full and distended and went to the bathroom to try to urinate; but she could not. She also felt something hanging out from her vagina, and when she checked further, she discovered that it was blood clot traceable from the bladder. Petitioner construed this to mean that the blood was issuing from the bladder. Petitioner took a picture of this hanging blood clot.

She then called the hospital and asked to speak with Dr. Ann Czarnik, and when the operator asked for her reason, petitioner explained her condition to her, whereupon the operator advised her to come to the emergency room as soon as possible. Petitioner then headed straight with her husband to the emergency room on March 01, 2015. On her way to the hospital, petitioner felt weaker and weaker and was in a lot of pain and sweating all over. At the emergency room, she could hardly speak because of her condition. She was then placed in the care of another doctor called Dr. Dille who explained that she was taking over from Dr. Ann Czarnik. She then ordered for Foley Catheter to be inserted on petitioner to drain the urine which was now almost black. The quantity of the urine was 550 cc.

Dr. Dille then scanned petitioner's bladder and observed that there was some blood clot blocking the passage of the blood. She then immediately ordered a CT scan of the bladder. But before petitioner was transported to do the CT scan, Dr. Dille called another doctor who came and interviewed petitioner. After she listened to petitioner's full account of events as happened, she stated that Dr. Ann Czarnik must have caused petitioner extreme trauma. While talking to petitioner, another doctor also came over to listen to petitioner's account. The two doctors now invited another male doctor, and after conferring among themselves for some time, thereafter told petitioner that they were going to first perform a pelvic exam to find out whether the first doctor that performed the surgery might have poked the bladder while sewing petitioner up after the surgery.

They finally performed this pelvic exam and made a visual conclusion that the stitches were all intact and everything was healing well. But they repeated to petitioner their decision to do the CT scan. They then transported petitioner to the CT scan room where for some unknown reason, petitioner spent a whole forty-five minutes for a process that normally takes not more than twenty minutes. After they took petitioner back to the emergency room, the doctors disclosed to her that there was a hole in her bladder as a result of the surgery performed by Dr. Michael Breen.

Thereafter, plaintiff was informed that they were going to keep the Catheter for two weeks, and that she was going to be discharged immediately. But a good friend of the plaintiff who was also a nurse made a loud protest against the decision to discharge plaintiff because she observed that petitioner's urine was still dark. Thereafter the doctors immediately reversed their decision and secured a room for plaintiff who stayed on admission for a further three days.

3

*For the entire* time after the surgery spanning plaintiff's traumatic distress, he never set eyes on Dr. Michael Breen, the doctor that originally performed the total hysterectomy. However after her discharge was delayed, Dr. Michael Breen who was on call on that particular day (i.e. March 01, 2015) came and saw plaintiff, whereupon plaintiff reiterated that she was not leaving the hospital until she felt *reasonably well*. Dr. Breen concurred and informed plaintiff that she was being recommended to see a *very good urologist* called Dr. Singh Herb. The Doctor came to see plaintiff who explained to Dr. Herb her situation. Dr. Singh also wondered aloud how the ER doctor prematurely discharged plaintiff without finding out where the blood was coming from.

The following day, (i.e. on March 03, 2015), plaintiff was taken to the operation room and had general anesthesia done again. The doctor did not consider the five millimeter hole to be big enough for stitches and therefore left the catheter intact. Finally, plaintiff was discharged on March 03, 2015 and was given a lot of pain medication. When plaintiff went home, he started bleeding again after only three days. She called Dr. Singh who advised her to come to her clinic. She examined plaintiff the following day and advised her that her insurance did not cover for the visit but she was going to examine plaintiff for free on that particular day because he felt very sad about what happened. He then referred her to another urologist called Dr. Lorene Jones who was within her HMO network.

Before seeing Dr. Jones, plaintiff was invited by Dr. Michael Breen for a follow-up. He advised plaintiff that she needed a cystogram (a type of CT scan) to ensure that the hole was no more leaking. The procedure was so painful that plaintiff nearly stopped them. The results of that cystogram was thereafter faxed to Dr. Jones who inspected it and concluded that the hole in plaintiff's bladder had not healed and was still leaking, and that plaintiff therefore needed to keep the catheter on for another two weeks.

After two weeks, plaintiff had to endure another CT scan after which Dr. Lorene Jones discontinued the catheter on March 31, 2015.

## CAUSES OF ACTION

Plaintiff has brought a cause of action in negligence against Dr. Michael Breen. Dr. Michael Breen owed the duty of providing standard medical care to Ms. Margaret Reid during her hysterectomy surgery which involved the removal of petitioner's uterus, cervix, ovaries and other surrounding reproductive organs. Upon discovery of petitioner's manifold scar tissue due to prior surgery, this standard would have required the defendant to open petitioner up, as he himself stated to the understanding of petitioner prior to the operation. Dr. Michael Breen breached this standard when he maneuvered around the scar tissue, putting undue stress on petitioner's bladder region and leading to the physical injury of a tear in her bladder and thereby proximately causing her the damage and distress and pain and suffering.

This failure amounts to a breach of the applicable standard of medical care.

As a direct and proximate result of the breach of the applicable standard of medical care by the Defendant, the Plaintiff: i. suffered conscious pain and suffering both in the past and, it is expected by

4

*her physicians*, the future, ii. incurred medical expenses in the past and will incur future medical expenses, iii. suffered mental and emotional sorrow and anguish, iv. was required to undergo additional medical procedures and has sustained other damages.

That the initial bladder damage sustained by the Plaintiff was the direct and proximate result of the *negligent actions and breaches* of the applicable standards of medical care by the Defendant without any act or omission on the part of the Plaintiff directly thereunto contributing.

That the Plaintiff did not assume the risk of her injuries.

Plaintiff alleges that on or about February 17, 2015 and thereafter, Defendant Michael Breen breached the applicable standard of medical care owed to the Plaintiff Margaret Reid, which directly caused a physical injury to the Plaintiff and was the direct and proximate cause of the Plaintiff's injuries and damages.

WHEREFORE: The Plaintiff claims monetary damages against Michael Breen individually in an amount to be determined at trial, plus costs, and for any further relief that this Honorable Court determines necessary and appropriate.

Furthermore, Ms. Margaret Reid intends to proceed against Dr. Ann Czarnik in negligence. Dr. Ann Czarnik had a duty to provide a reasonable standard of medical care to petitioner as per their doctor-patient relationship. But defendant deviated from this standard of medical care during the care and treatment of the Plaintiff on or about February 28, 2015, when during care of plaintiff, she did not exercise acceptable standard of care in determining plaintiff's source of ailment, viz. where blood was issuing from and insisted that petitioner was suffering from urinary tract infection, despite that petitioner sufficiently described her condition to defendant.

Dr. Ann Czarnik deviated from the reasonable standard of medical care by her refusal to inspect the urine of petitioner despite having information that petitioner's urine was dark, and also by her premature discharge of petitioner. This deviation was the direct and proximate cause of *a physical injury* to the plaintiff and the direct and proximate cause of all of the plaintiff's consequent pain and suffering. WHEREFORE: plaintiff claims money damages against Dr. Ann Czarnik in an amount to be determined at trial, plus costs, and for any further relief that the Court determines necessary and appropriate.

Again, as to Dr. Ann Czarnik, plaintiff will proceed with a cause of action in intentional infliction of emotional distress (IIED).

Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 34 to 37 against second defendant Dr. Ann Czarnik and in addition, asserts a cause of action in Intentional Infliction of Emotional Distress ("IIED") against same.

The elements for a cause of action for IIED are as follows:

i. The plaintiff is a person. ii. The defendant acted intentionally or recklessly. iii. The emotional *distress* suffered by the plaintiff was severe. 4. The defendant's conduct was extreme and outrageous. iv. The

5

*defendant's* conduct proximately caused the plaintiff's emotional distress. v. No alternative cause of action will provide a remedy for the severe emotional distress caused by the defendant's conduct.

Kroger Tex. L.P. v. Suberu, 216 S.W.3d 788, 796 (Tex.2006); Hoffman-La Roche, Inc., v. Zeltwanger, 144, S.W.3d 438, 447 (Tex.2004); Tiller v. Mclure, 121 S.W.3d 709, 713 (Tex.2003).

*Petitioner is* a person who had a patient-doctor relationship with second defendant on whom she thereby entrusted her health. But defendant's action, from the onset was patently reckless, if not totally intentional. She initiated a battery of tests on petitioner and came up with her own misdiagnosis despite petitioner's protestations. She ignored the dignity and feelings of petitioner and the suggestion of nurses when she was called to come and see patient's urine, but instead, came with discharge papers and totally ignored petitioner's painful protestations.

Given the nature of defendant's conduct, it meets the threshold for being extreme and outrageous because of the level of sheer disregard for professional care and decorum for the petitioner, and her insistence in the face of plaintiff's denial that plaintiff was suffering from UTI. Defendant's action is the direct and proximate cause of plaintiff's distress.

Defendant is therefore liable to plaintiff for her emotional distress.

Given the severity of plaintiff's distress, no alternative cause of action would provide a remedy for the severe emotional distress caused by the defendant's conduct.

WHEREFORE: The Plaintiff claims monetary damages against Defendant Anne Czarnik in an amount to be determined at trial, plus costs, and for any further relief that this Honorable Court deems necessary and appropriate.

As to Seton Hospital, plaintiff will proceed in medical malpractice based on the theory of Respondeate Superior and/or Agency

*This is* because during all of the times that the plaintiff was receiving medical care and treatment from defendants Michael Breen M.D. and Ann Czarnik, MD, these defendants were employed by Seton Hospital, and that they were agents of their employer acting within the scope of their employment.

Thus Defendant Seton Hospital is responsible, via the theories of agency and respondeate superior for the breach of applicable medical care caused by their employees, the defendants herein, which resulted in a physical injury to the Plaintiff.

WHEREFORE: The Plaintiff claims monetary damages against Defendant Seton Hospital in an amount to be determined at trial, plus costs, and for any further relief that this Honorable Court deems necessary and appropriate.

## STIPULATION

We hereby stipulate, in response to your original answer to plaintiff's suit, that the plaintiff's lawsuit has been filed without prior notice to you and without furnishing you with a medical authorization form as required in 74.052 of the code.

This notice is therefore intended to cure that pleading defect. It is also intended to abate the lawsuit for sixty days after your receipt of this letter in accordance with the relevant rules.

It also tolls the applicable statute of limitations to and including a period of 75 days following the giving of the notice. This tolling shall apply to all parties and potential parties.

Please also note that all parties shall be entitled to obtain complete and unaltered copies of the patient's medical records from any other party within 45 days from the date of receipt of a written request for such records; provided, however, that the receipt of a medical authorization in the form required by Section 74.052 executed by the claimant herein shall be considered compliance by the claimant with this subsection.

## CONCLUSION

You may contact my office for any questions, concerns or proposal for amicable settlement.

Thank you.

Respectfully submitted,

Samuel Adjei Sarfo

Texas Bar No.: 24071896

Attorney for Margaret Reid

# AUTHORIZATION FORM FOR RELEASE OF PROTECTED HEALTH INFORMATION

A. I, Margaret Reid, hereby authorize Michael Breen to obtain and disclose (within the parameters set out below) the protected health information described below for the following specific purposes:

1. To facilitate the investigation and evaluation of the health care claim described in the accompanying Notice of Health Care Claim; or

2. Defense of any litigation arising out of the claim made the basis of the accompanying Notice of Health Care Claim.

B. The health information to be obtained, used, or disclosed extends to and includes the verbal as well as the written and is specifically described as follows:

1. The health information in the custody of the following physicians or health care providers who have examined, evaluated, or treated Margaret Reid in connection with the injuries alleged to have been sustained in connection with the claim asserted in the accompanying Notice of Health Care Claim. (Here list the name and current address of all treating physicians or health care providers).

    1.  Dr. Ann Czarnik

17900 FM 1896

Austin, Texas 78737-1407

    2.  Dr. Michael Breen

17900 FM 1896

Austin, Texas 78737-1407


This authorization shall extend to any additional physicians or health care providers that may in the future evaluate, examine, or treat Margaret Reid for injuries alleged in connection with the claim made the basis of the attached Notice of Health Care Claim;

2. The health information in the custody of the following physicians or health care providers who have examined, evaluated, or treated Margaret Reid during a period commencing five years prior to the incident made the basis of the accompanying Notice of Health Care Claim. (Here list the name and current address of such physicians or health care providers, if applicable.)


**Dr. Terri Bagwell**

**1710 Red River Street, Ste. 2104**

**Austin, Texas 78701**

1

**C. Excluded Health Information--the following constitutes a list of physicians or health care providers possessing health care information concerning Margaret Reid to which this authorization does not apply because I contend that such health care information is not relevant to the damages being claimed or to the physical, mental, or emotional condition of Margaret Reid arising out of the claim made the basis of the accompanying Notice of Health Care Claim. (Here state "none" or list the name of each physician or health care provider to whom this authorization does not extend and the inclusive dates of examination, evaluation, or treatment to be withheld from disclosure.)**

**NONE**

D. The persons or class of persons to whom the health information of Margaret Reid will be disclosed or who will make use of said information are:

1. Any and all physicians or health care providers providing care or treatment to Margaret Reid;

2. Any liability insurance entity providing liability insurance coverage or defense to any physician or health care provider to whom Notice of Health Care Claim has been given with regard to the care and treatment of Margaret Reid;

3. Any consulting or testifying experts employed by or on behalf of Michael Breen with regard to the matter set out in the Notice of Health Care Claim accompanying this authorization;

4. Any attorneys (including secretarial, clerical, or paralegal staff) employed by or on behalf of Michael Breen with regard to the matter set out in the Notice of Health Care Claim accompanying this authorization;

5. Any trier of the law or facts relating to any suit filed seeking damages arising out of the medical care or treatment of Margaret Reid.

E. This authorization shall expire upon resolution of the claim asserted or at the conclusion of any litigation instituted in connection with the subject matter of the Notice of Health Care Claim accompanying this authorization, whichever occurs sooner.

F. I understand that, without exception, I have the right to revoke this authorization in writing. I further understand the consequence of any such revocation as set out in Section 74.052, Civil Practice and Remedies Code.

G. I understand that the signing of this authorization is not a condition for continued treatment, payment, enrollment, or eligibility for health plan benefits.

H. I understand that information used or disclosed pursuant to this authorization may be subject to redisclosure by the recipient and may no longer be protected by federal HIPAA privacy regulations.

Signature of Patient

---

MARGARET REID

Date: October 05, 2015

2

Appendix Tab 4

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 4. Liability in Tort
      Chapter 74. Medical Liability (Refs & Annos)
        Subchapter H. Procedural Provisions (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 74.351

§ 74.351. Expert Report

Effective: September 1, 2013
Currentness

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.

(b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

(1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

(2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

(c) If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice.

(d) to (h) [Subsections (d)-(h) reserved]

(i) Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

(j) Nothing in this section shall be construed to require the serving of an expert report regarding any issue other than an issue relating to liability or causation.

(k) Subject to Subsection (t), an expert report served under this section:

    (1) is not admissible in evidence by any party;

    (2) shall not be used in a deposition, trial, or other proceeding; and

    (3) shall not be referred to by any party during the course of the action for any purpose.

(*l*) A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).

(m) to (q) [Subsections (m)-(q) reserved]

(r) In this section:

    (1) "Affected parties" means the claimant and the physician or health care provider who are directly affected by an act or agreement required or permitted by this section and does not include other parties to an action who are not directly affected by that particular act or agreement.

    (2) "Claim" means a health care liability claim.

    (3) [reserved]

    (4) "Defendant" means a physician or health care provider against whom a health care liability claim is asserted. The term includes a third-party defendant, cross-defendant, or counterdefendant.

    (5) "Expert" means:

        (A) with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

        (B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;

(C) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence;

(D) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a dentist, a dentist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence; or

(E) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a podiatrist, a podiatrist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

(s) Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for the acquisition by the claimant of information, including medical or hospital records or other documents or tangible things, related to the patient's health care through:

(1) written discovery as defined in Rule 192.7, Texas Rules of Civil Procedure;

(2) depositions on written questions under Rule 200, Texas Rules of Civil Procedure; and

(3) discovery from nonparties under Rule 205, Texas Rules of Civil Procedure.

(t) If an expert report is used by the claimant in the course of the action for any purpose other than to meet the service requirement of Subsection (a), the restrictions imposed by Subsection (k) on use of the expert report by any party are waived.

(u) Notwithstanding any other provision of this section, after a claim is filed all claimants, collectively, may take not more than two depositions before the expert report is served as required by Subsection (a).

**Credits**
Added by Acts 2003, 78th Leg., ch. 204, § 10.01, eff. Sept. 1, 2003. Amended by Acts 2005, 79th Leg., ch. 635, § 1, eff. Sept. 1, 2005; Acts 2013, 83rd Leg., ch. 870 (H.B. 658), § 2, eff. Sept. 1, 2013.

V. T. C. A., Civil Practice & Remedies Code § 74.351, TX CIV PRAC & REM § 74.351
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Appendix Tab 5

Vernon's Texas Statutes and Codes Annotated
Civil Practice and Remedies Code (Refs & Annos)
Title 4. Liability in Tort
Chapter 74. Medical Liability (Refs & Annos)
Subchapter B. Notice and Pleadings

V.T.C.A., Civil Practice & Remedies Code § 74.051

§ 74.051. Notice

Effective: September 1, 2003
Currentness

(a) Any person or his authorized agent asserting a health care liability claim shall give written notice of such claim by certified mail, return receipt requested, to each physician or health care provider against whom such claim is being made at least 60 days before the filing of a suit in any court of this state based upon a health care liability claim. The notice must be accompanied by the authorization form for release of protected health information as required under Section 74.052.

(b) In such pleadings as are subsequently filed in any court, each party shall state that it has fully complied with the provisions of this section and Section 74.052 and shall provide such evidence thereof as the judge of the court may require to determine if the provisions of this chapter have been met.

(c) Notice given as provided in this chapter shall toll the applicable statute of limitations to and including a period of 75 days following the giving of the notice, and this tolling shall apply to all parties and potential parties.

(d) All parties shall be entitled to obtain complete and unaltered copies of the patient's medical records from any other party within 45 days from the date of receipt of a written request for such records; provided, however, that the receipt of a medical authorization in the form required by Section 74.052 executed by the claimant herein shall be considered compliance by the claimant with this subsection.

(e) For the purposes of this section, and notwithstanding Chapter 159, Occupations Code, or any other law, a request for the medical records of a deceased person or a person who is incompetent shall be deemed to be valid if accompanied by an authorization in the form required by Section 74.052 signed by a parent, spouse, or adult child of the deceased or incompetent person.

**Credits**
Added by Acts 2003, 78th Leg., ch. 204, § 10.01, eff. Sept. 1, 2003.

V. T. C. A., Civil Practice & Remedies Code § 74.051, TX CIV PRAC & REM § 74.051
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Appendix Tab 6

Vernon's Texas Statutes and Codes Annotated
    Civil Practice and Remedies Code (Refs & Annos)
      Title 4. Liability in Tort
        Chapter 74. Medical Liability (Refs & Annos)
          Subchapter B. Notice and Pleadings

V.T.C.A., Civil Practice & Remedies Code § 74.052

§ 74.052. Authorization Form for Release of Protected Health Information

Effective: September 1, 2003
Currentness

(a) Notice of a health care claim under Section 74.051 must be accompanied by a medical authorization in the form specified by this section. Failure to provide this authorization along with the notice of health care claim shall abate all further proceedings against the physician or health care provider receiving the notice until 60 days following receipt by the physician or health care provider of the required authorization.

(b) If the authorization required by this section is modified or revoked, the physician or health care provider to whom the authorization has been given shall have the option to abate all further proceedings until 60 days following receipt of a replacement authorization that must comply with the form specified by this section.

(c) The medical authorization required by this section shall be in the following form and shall be construed in accordance with the "Standards for Privacy of Individually Identifiable Health Information" (45 C.F.R. Parts 160 and 164).

**AUTHORIZATION FORM FOR RELEASE OF PROTECTED HEALTH INFORMATION**

A. I, _____ (name of patient or authorized representative), hereby authorize _____ (name of physician or other health care provider to whom the notice of health care claim is directed) to obtain and disclose (within the parameters set out below) the protected health information described below for the following specific purposes:

  1. To facilitate the investigation and evaluation of the health care claim described in the accompanying Notice of Health Care Claim; or

  2. Defense of any litigation arising out of the claim made the basis of the accompanying Notice of Health Care Claim.

B. The health information to be obtained, used, or disclosed extends to and includes the verbal as well as the written and is specifically described as follows:

  1. The health information in the custody of the following physicians or health care providers who have examined, evaluated, or treated _____ (patient) in connection with the injuries alleged to have been sustained in connection with the claim asserted in the accompanying Notice of Health Care Claim. (Here list the name and current address of all treating physicians or health care providers). This authorization shall extend to any additional physicians or health care providers that may in the future evaluate, examine, or treat _____ (patient) for injuries alleged in connection with the claim made the basis of the attached Notice of Health Care Claim;

2. The health information in the custody of the following physicians or health care providers who have examined, evaluated, or treated _____ (patient) during a period commencing five years prior to the incident made the basis of the accompanying Notice of Health Care Claim. (Here list the name and current address of such physicians or health care providers, if applicable.)

C. Excluded Health Information--the following constitutes a list of physicians or health care providers possessing health care information concerning _____ (patient) to which this authorization does not apply because I contend that such health care information is not relevant to the damages being claimed or to the physical, mental, or emotional condition of _____ (patient) arising out of the claim made the basis of the accompanying Notice of Health Care Claim. (Here state "none" or list the name of each physician or health care provider to whom this authorization does not extend and the inclusive dates of examination, evaluation, or treatment to be withheld from disclosure.)

D. The persons or class of persons to whom the health information of _____ (patient) will be disclosed or who will make use of said information are:

1. Any and all physicians or health care providers providing care or treatment to _____ (patient);

2. Any liability insurance entity providing liability insurance coverage or defense to any physician or health care provider to whom Notice of Health Care Claim has been given with regard to the care and treatment of _____ (patient);

3. Any consulting or testifying experts employed by or on behalf of _____ (name of physician or health care provider to whom Notice of Health Care Claim has been given) with regard to the matter set out in the Notice of Health Care Claim accompanying this authorization;

4. Any attorneys (including secretarial, clerical, or paralegal staff) employed by or on behalf of _____ (name of physician or health care provider to whom Notice of Health Care Claim has been given) with regard to the matter set out in the Notice of Health Care Claim accompanying this authorization;

5. Any trier of the law or facts relating to any suit filed seeking damages arising out of the medical care or treatment of _____ (patient).

E. This authorization shall expire upon resolution of the claim asserted or at the conclusion of any litigation instituted in connection with the subject matter of the Notice of Health Care Claim accompanying this authorization, whichever occurs sooner.

F. I understand that, without exception, I have the right to revoke this authorization in writing. I further understand the consequence of any such revocation as set out in Section 74.052, Civil Practice and Remedies Code.

G. I understand that the signing of this authorization is not a condition for continued treatment, payment, enrollment, or eligibility for health plan benefits.

H. I understand that information used or disclosed pursuant to this authorization may be subject to redisclosure by the recipient and may no longer be protected by federal HIPAA privacy regulations.

Signature of Patient/Representative

..........................................................................................................................................................................

Date

_____

Name of Patient/Representative

......................................................................................................................................................................................

Description of Representative's Authority

......................................................................................................................................................................................

**Credits**
Added by Acts 2003, 78th Leg., ch. 204, § 10.01, eff. Sept. 1, 2003.

V. T. C. A., Civil Practice & Remedies Code § 74.052, TX CIV PRAC & REM § 74.052
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.